[Civ. No. 15391.  First Dist., Div. One.  Apr. 30, 1953.]

MARY MILLER, as Administratrix, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

Arthur B. Dunne, John W. Martin and Dunne, Dunne & Phelps for Appellant.

James A. Myers Hildebrand, Bills & McLeod and D. W. Brobst for Respondent.

WOOD (Fred B.), J.—This is an action against the Southern Pacific Company brought by the administratrix of the estate of Fred A. Miller, deceased, for the benefit of the widow and four minor children of the deceased for damages for his death which occurred as the result of injuries suffered

by him while employed by the defendant in interstate commerce.

The action was brought under the Federal Employers' Liability Act which declares that every common carrier by railroad while engaging in interstate commerce "shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." (45 U.S.C.A., § 51.)

In any such action the "employee shall not be held to have assumed the risks of his employment in any case [where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier; and no employee shall be held to have assumed the risks of his employment in any case][1] where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee." (45 U.S.C.A., § 54.) In any such action "the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: *Provided,* That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for

---

[1]The words within these brackets were inserted by amendment of the section in 1939. (Act of Aug. 11, 1939, ch. 685, § 1, 53 Stats. 1404.)

In *Tiller* v. *Atlantic Coast Line R. Co.* (1943), 318 U.S. 54 [63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967], the Supreme Court held that "every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment, and that Congress, by abolishing the defense of assumption of risk in that statute, did not mean to leave open the identical defense for the master by changing its name to 'non-negligence.'" (P. 58.)

The court in the Tiller case traced the origin and history of the assumption of risk doctrine (pp. 58-64), and concluded that the "result is an Act which requires cases tried under the Federal Act to be handled as though no doctrine of assumption of risk had ever existed." (P. 64.)

The court in that case further concluded that "the employer's liability is to be determined under the general rule which defines negligence as the lack of due care under the circumstances; or the failure to do what

the safety of employees contributed to the injury or death of such employee.'' (45 U.S.C.A., § 53.)

At the time of the injury the decedent was working as a brakeman in defendant's yard at Gerber, California, engaged in making up a freight train which was soon to leave for the north. That train was on a side track, parallel to the main line, headed north. Decedent was last seen, prior to the accident, standing on the ground near the head of the freight train and between that train and the main line. Shortly thereafter a southbound passenger train passed that point. The gist of the first count of the complaint is that decedent was standing at the head end of the freight train engaged in attempting to receive a signal from another employee who was at the rear end of the train; that defendant, in disregard of its duty of exercising ordinary care to provide decedent with a reasonably safe place to work, carelessly and negligently constructed and maintained a certain signal box with arms located between these two tracks in such a position as to obstruct the view of the decedent in attempting to receive the signal from the brakeman at the rear of the train; that in order to see the signal it was necessary for decedent to, and he did, stand alongside of the main line, and as a result of defendant's said carelessness and negligence decedent was struck by the southbound train, as a proximate result of which he received the injuries. In the second count of the complaint, plaintiff additionally alleged that at the time and place mentioned defendant, by and through its employees other than decedent, carelessly and negligently operated the passenger train on the main line in a southerly direction and that by reason thereof and defendant's careless and negligent construction and maintenance of the signal and as a

---

a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done. A fair generalization of the rule is given in the Senate Committee report on the 1939 amendment: 'In justice, the master ought to be held liable for injuries attributable to conditions under his control when they are not such as a reasonable man ought to maintain in the circumstances.' Of course in any case the standard of care must be commensurate to the dangers of the business.'' (P. 67.)

Justice Frankfurter, concurring, made this comment: ''The basis of an action under the Act remains the carrier's negligence. The carrier is not to be relieved from the consequences of its negligence by any claim that the employee 'assumed the risk' of its negligence. But neither is the carrier to be charged with those injuries which result from the 'usual risks' incident to employment on railroads—risks which cannot be eliminated through the carrier's exercise of reasonable care.'' (P. 72.)

direct and proximate result thereof, the passenger train struck decedent and injured him.

The jury awarded plaintiffs a verdict for $80,032.50 and judgment was entered thereon. Defendant moved for a new trial and for judgment notwithstanding the verdict. Upon denial of those motions defendant appealed from the judgment and from the order denying its motion for judgment notwithstanding the verdict. Upon this appeal defendant presents two questions: (1) Is the evidence sufficient to sustain the verdict, and (2) Is the amount of damages awarded excessive?

(1) *The issue as to the sufficiency of the evidence to sustain the verdict* poses these questions: Is the evidence sufficient to support implied findings that defendant negligently failed to provide a reasonably safe place of employment or negligently operated the passenger train, and if so, in either case, was such negligence a proximate cause of the injury suffered by decedent Miller? There is involved no violation by defendant of any statute enacted for the safety of employees. A fairly detailed statement of the pertinent facts is desirable.

Miller, the decedent, had worked for the defendant, as a brakeman on the Shasta Division, since 1943. He had worked in and out of Gerber. He was familiar with the physical set-up of the yard and with the operations being conducted. For the last 30 days he had been operating between Dunsmuir and Gerber as a member of the same crew as on this occasion. He and his fellow crew members reported for duty at sometime prior to 5 o'clock on the morning of October 2, 1950. The crew consisted of the conductor, engineer, fireman, and three brakemen. Miller was one of the brakemen.

Their train, the second section of No. 620 (Second 620), consisting of 95 freight cars and a diesel locomotive of 4 units, stood on the side track immediately west of and parallel to the main line track with its caboose about 300 or 400 feet north of the Gerber depot and its head end approximately 4,800 feet to the north of the caboose. The distance between the two tracks, measured from center to center between the rails, was 17 feet 11 inches, with a clearance of about 7 feet 2 inches between trains when both tracks are occupied.

The first section of No. 620 (First 620) was on a side track parallel to and west of the side track first mentioned. Neither section could leave until it had been readied by its crew nor until a fast passenger train (First 11, The Cascade Limited) arrived from the north. Second 620 could not leave until First

620 had pulled out. First 11 was due at Gerber at 4:55 a.m. It was a few minutes late. Its head end passed the head end of Second 620 at 5:07 a.m.

Miller and Lyman G. Newton, head brakeman, met at the caboose of Second 620 and proceeded to walk the length of the train from the rear to the head end, Miller on the left side and Newton on the right, inspecting the train and connecting air hoses where necessary. They were still on opposite sides of the train when they arrived at the rear end of the locomotive. Newton then connected the air hose of the locomotive to that of the first car. (That was the last time he saw Miller until after the accident.) The engineer then commenced pumping up the train,[2] a process which continued until after First 11 had passed by. Newton retraced his steps part way for a distance of about 20 cars to see that the air was coming through, then turned and proceeded forward again until he reached a point three or four cars back of the locomotive. He remained there until First 11 passed. He said he was more or less looking back toward the rear of his train when First 11 went by and he first saw it about as it passed by. He stepped back between two cars of his train, as a safety matter, there being suction from a train going by there, from a streamliner, when it goes by at a high rate of speed.

Meanwhile, the conductor, S. H. Birdwell, reported at defendant's Gerber office, obtained his bills and the line-up (a statement of what trains were moving, with respect to which he would have to govern the operation of his own train), went to the caboose, left his bills there and then walked to the head end of the train, leaving the rear brakeman, Nelson, at the caboose. On the way he passed Newton, gave him the line-up and then went on and met and spoke with Miller who was then standing between the freight train and the main line

---

[2] The brakes of a freight train are operated by compressed air. The air is furnished by compressors on the diesel units of the locomotive. It is transmitted the length of the train, to each car on the train, by pipes built onto the cars. The pipes of the cars are connected by air hoses which are coupled at the point of coupling of the cars. The first thing to be done after the air hoses are coupled is for the engineer to pump up his train.

To make sure this work is properly done and that the brakes are working, a test must be made before the train can leave. The method of making this test, and the method followed on this occasion, was to pump up until a gauge in the caboose registered 65 pounds. When this pressure in the caboose has been reached, the rear brakeman gives a light signal to the head end of the train. The brakeman at the head of the train, on receiving this signal, passes it to the engineer, and the engineer then makes his brake test.

about opposite the middle of the first diesel unit; that Miller was then where he, the conductor, instructed Miller to be. First 11 was then in sight, coming through Rawson, 4.1 miles away. Its headlights could be seen. (Between Gerber and Rawson the main line track is straight.) Conductor Birdwell further testified: "When I arrived at where Mr. Miller was standing I gave him the line up of what we were doing, when we were going to leave, and trains approaching us." "When I spoke to Mr. Miller I told him that was First 11, and that we were stuck there for an opposing extra train . . . He said 'O.K.' " Birdwell also said he had given instructions to his crew not to give the brake test signal when a train was approaching on the main line track. He was then asked "You never did tell Mr. Miller that, though, did you—the swing brakeman?" He responded: "Mr. Miller was not working on the rear of the train." Continuing, Birdwell testified that he was the only man of his crew who knew that First 11 was late, he having received that information from the telegraph office. He added that in railroad practice if one does not have information that a particular train has arrived, "it is late." Upon leaving Miller, Birdwell got in the cab of the locomotive of Second 620, gave the orders to the engineer and the fireman and was there when First 11 passed the head end of Second 620.

Concerning the speed of First 11, the defendant's applicable regulations were as follows: A speed board is placed ¾ of a mile in advance of the point where the restriction is effective, to give a train time to reduce its speed. At speeds in excess of 51 miles an hour, when a train is making a change in speed, a tolerance of 5 miles per hour is allowed. Near Proberta, 1 mile north of Kiska,[3] there was a speed board indicating 60 miles per hour. Just north of Kiska there was a speed board indicating 35 miles per hour, effective at a point 3,696 feet south of Kiska. The head end of Section 620 was 878 feet south of Kiska. Hence the authorized speed limit for First 11 at the head of the freight train and at the spot where Miller was found, was 60 to 65 miles per hour. The engineer of First 11 testified that he was making 79 miles per hour up to the 60-mile per hour speed board north of the Proberta road crossing; that he then started to slow down; that he shut off his engines and used the dynamic brake; that the speed was reducing as he was getting into Kiska and as he passed the

---

[3]Kiska is one mile north of Gerber.

head end of Second 620. He testified that as he passed Kiska he would judge that his speed was between 70 and 65 miles an hour, a point 878 feet north of the head end of Second 620. First 11's speed tape showed no violation of speed restrictions. It showed that the speed was 70 miles per hour at Kiska and that then a rapid deceleration began, and that there was still a rapid deceleration as the head end of the streamliner passed the head end of Second 620; that from the point where speed started dropping off from 70 miles per hour, it dropped off to 60 miles per hour in slightly over ⅛ of a mile, in approximately 700 feet. That indicates a probable reduction of speed to 60 miles per hour (possibly between 60 and 65 miles per hour) before First 11 reached the head end of Second 620.

First 11 was equipped with a headlight that could be dimmed, a Mars light (one which swings in a figure eight), classification lights, a bell which rings automatically after being turned on, and an air horn. The Mars light is turned off and the headlight dimmed upon approaching another train, to facilitate identification by rendering the identification lights more readily observable. First 11 was required to signal Second 620 by whistle, and Second 620 to respond by whistle. Each train complied with this requirement. The engineer of First 11 testified that about 20 to 25 car lengths north of Kiska he shut off the Mars light, dimmed his headlight and then gave the whistle signal; that before this he had started the automatic bell ringing, about 1,000 feet north of the crossing at Proberta, and that the bell continued to ring until the stop at Gerber. The engineer of Second 620 testified that he first saw First 11 when it was north of Proberta; that the Mars light was then operating and the headlight was on bright; that he did not notice it again until it whistled, and at that time the Mars light was off and the headight dimmed; that it started to whistle when it was 200 feet or more away and that its bell was then ringing. The fireman of Second 620 said the Mars light was on and the headlight was on bright when he first saw First 11; that he could not say when the Mars light was shut off; that the fixed headlight was dimmed at 10 to 15 car lengths before First 11 passed the head end of Second 620; that the whistle signal was given about when the headlight was dimmed and that this was at about a certain point which was 878 feet north of the head end of Second 620. Newton, the head brakeman of Second 620, was unable to say when the Mars

light was turned off or the headlight dimmed, but testified that First 11 sounded its whistle beginning about 200 feet before it reached the engine of Second 620 and it continued to blow.

During the approach and passing of First 11, the freight train's diesel engines were operating, pumping air into the brake system, making considerable noise. All four diesel units were running. In spite of this noise, the engineer, fireman, conductor and head brakeman of Second 620 heard the whistle of First 11 as it approached.

Richard H. Williams, a freight conductor who had worked on defendant's Shasta Division for 28 years, testified that when a train travels at 65 to 79 miles an hour it creates a suction which has a tendency to cause a person to lose his balance and be drawn down and around and off his feet if he is close enough to the train. The witness said "in that particular spot [where Second 620 was being made up and First 11 was passing] there is room for you to get clear back away from the train a good distance." George R. Beatty, a brakeman in the employ of defendant on its Sacramento Division, who had worked on the Gerber yard for three months in 1950, said that lots of suction is created by high speed trains.

Defendant had in force certain safety regulations governing the conduct of trainmen, including Miller, in the situation described. Among them were these: ". . . safety is one of the first importance in the discharge of duty. Obedience to the rules is essential to safety and is required." (General Notice.) Each employee is required to have a copy of the rules and a time table when on duty (Rules A and 841). (Every member of the crew of Second 620 had a time table.) "Employees must keep sufficient distance from passing trains to avoid possibility of being struck by anything projecting or that may fall or be thrown therefrom. On double track, they should keep outside of and clear of both tracks while train is passing. They must not depend on others to notify them of approaching trains, engines, or cars." (Rule 817.) "Look in both directions before crossing any track and be especially careful when coming out of or from behind an engine, car, building, or other structure." (Rule 2001.) "Never cross tracks closely in front of moving trains, cars, and engines." (Rule 2002.) "Always keep safe distance from passing cars, engines, and trains, to avoid being struck by falling or projecting objects." (Rule 2111.)

After First 11 had passed and was in the station at Gerber, Nelson, the rear brakeman, gave the light signal for the brake test. Newton picked it up and undertook to relay it to the head end. He got no response. So he walked toward the head end and found Miller unconscious, lying between the side track and the main line at about the rear of the first unit of the diesel locomotive. Miller's lantern was upright on the ground midway between the side track and the main line, about 8 to 10 feet north of him and toward the head end of Second 620. His comb and pencil were found about 10 feet south of him. The signs of injury observed were fractures of the right leg and right wrist and bruises on the back and rib area to the right. Newton said that the place where Miller was found was a part of his proper position in the performance of his duties. When Miller was working for Conductor Birdwell, that is where the witness would expect Miller to be. One of Miller's duties was that of looking for the signal from the rear man.

Between the spot where Miller was found and the rear end of the freight train, there were a water column, an oil column and a semaphore block signal, situate between the main line and the side track. Several hundred feet south of Gerber there is a lighted three-phase approach signal. This signal shines to the north so that if one were standing north of Gerber and looking to the south he would be looking into those signal lights. At the time of this accident, the Gerber station was lighted and in addition to the signal lights south of the station there was a floodlight at Gerber. The practice, in the Gerber yard, in the circumstances that existed at the time of this accident, of giving the signal at the rear end of the train, was by use of a fusee. A fusee is an object similar in form to a candle which can be lighted at one end. It burns with a red light. The method of giving this signal by the rear brakeman is to wave this red light horizontally across the track. Because of the oil and water columns, the block signal and the lights mentioned, it is difficult for a man at the head end to get this signal from the man at the rear of the train if both stand between the side track and the main line and close to the train on the side track. Accordingly, either the rear man goes out toward or across the main line or the man at the head end does so.

Wilson R. Callick, a brakeman in the employ of the defendant on its Shasta Division since 1937, testified that in

making up a 95-car train having a 4-unit diesel and a caboose, on this side track, the caboose is south of these obstructions (the oil and water columns and the block signal). Newton said that in making the brake test signal, the man giving it or the man receiving it has to move over to the main line "especially if the caboose is where it was that particular morning. It is behind . . . that water column and the oil column, and up above that a ways there is a signal in line, and it is easier to see if you step over." Beatty testified that with a train the length of Second 620 the caboose would be about 100 feet south of the oil column. Williams said the oil and water columns were practically together, within a few feet of each other. The block signal, it would appear, was a short distance north of these columns. The exact distance in feet or yards, apparently, was not given. Asked if it was necessary to move over to the main line to get the brake test signal, Birdwell said: "I don't know what the factor is that entered into it exactly, unless it is the length of the train, but sometimes you have got to separate that light from other objects back there—I mean that light from your caboose."

No one saw Miller at the time of the accident. The circumstances warrant the inference that he was injured during the passage of First 11, by coming in contact with it. Precisely how that contact occurred we have no direct information.

Plaintiffs claim (1) that the narrow working space (7 feet 2 inches of clearance when both tracks are occupied) and the obstructions to the view of the brakeman (block signal, water column, and oil column) would support an implied finding that the defendant negligently failed to furnish Miller a reasonably safe place of employment; (2) that the operation of the passenger train, First 11, at an excessive rate of speed, turning off its Mars light, dimming its fixed headlight, and free-wheeling (thereby making less noise than with the diesels operating) would support an implied finding that defendant was negligently operating First 11, charged as defendant was with knowledge that men were at work in the Gerber yard making Second 620 ready; and (3) that the jury could reasonably infer that Miller, in the performance of his duty to watch for and relay the rear brakeman's signal, not aware of the approach of First 11 and having no way of determining its speed, drew near to the main line track to watch for and observe the rear brakeman's signal, and was hit by First 11 or stepped into or was sucked into the

side of First 11 or was thrown down by the suction created by it.

Defendant criticizes the plaintiffs' analysis of the facts in evidence. It claims that the nearness of the tracks and the presence of the block signal, water column and oil column did not furnish evidence of a negligent failure to provide a reasonably safe place of employment because there was no evidence that higher standards could reasonably be required; i.e., these tracks were farther apart than is usual (indicated by the testimony of one witness and by regulations of the federal government and of this and other states), and the obstructions mentioned were necessary facilities which would not be useful if placed elsewhere. That may be so when considered in the abstract; not necessarily so when viewed in the light of the work in hand, the readying of Second 620 for its northbound trip.

Defendant further claims that there was nothing about the operation of the southbound passenger train, First 11, that indicates negligence. That operation was completely regular, in full conformity with all applicable regulations of the defendant company. That is a factor which merits serious consideration. Yet the jury may quite properly have weighed in the balance the possible need and feasibility of the defendant's imposing upon First 11 a much slower speed than 60 to 65 miles as it passed the head end of Miller's train, charged as defendant was with knowledge of the work Miller and his fellow crew members were doing.

Defendant also contends that the evidence shows that Miller was charged with knowledge that First 11 was soon to arrive, and that he was expressly notified of its approach when the conductor spoke to him and gave him his line up, at which time First 11 was but 4 miles away with headlights visible. Of this we may observe that merely handing Miller his "line up," while he was standing there in the dark, did not of itself give him actual knowledge of the immediacy of the advent of First 11. Nor did the conductor's telling Miller "that was First 11" and Miller's responding "O.K." compel the jury to conclude that Miller heard and comprehended all that was said. The noise which the diesel of his train was making may have obscured much of that, and there is a basis for an inference that he was looking toward the rear, not toward the oncoming passenger train. ■ Having crossed from the left to the right side of his train after completing his work of inspection, he placed himself where his conductor instructed

him to be, in a position that would enable him to perform his duty of watching for the brake test signal and of relaying it to the engineer. These facts would warrant the inference that he was actually engaged in the performance of that duty, unaware of the imminence of the approach of First 11.

"To this evidence must be added the presumption that the deceased was actually engaged in the performance of those duties and exercised due care for his own safety at the time of his death." (*Tennant* v. *Peoria & P. U. Ry. Co.*, 321 U.S. 29, 34 [64 S.Ct. 409, 88 L.Ed. 520].)[4]

These are not all of the factors which the jury may have considered and weighed. There are two aspects of the problem: (1) The possible adjustment of defendant's yard lay-out and its streamliner schedule to the local operation of making up a freight train, and (2) the possible adaptation of this local operation to the yard lay-out and the main line schedule. We have considered the former; i.e., whether the tracks should be spaced farther apart, the oil and water columns and block signal relocated, and the speed of the streamliners reduced as they enter Gerber yard. Under the circumstances of this case we do not perceive, nor do we infer that the jury impliedly found, a duty resting upon defendant to adjust its yard lay-out and its streamliner schedule to the operation of making up this freight train, Second 620, upon this occasion. How about the other aspect? Might it be feasible to so change the method and manner of making up the freight train and of giving the brake test signal as to avoid or reduce the hazards to which Miller was subjected?

Miller's conductor indicated it was the length of this freight train which put the caboose so far back. The jury may have considered that this particular side track was too short for the making up of so long a train, that the omission of a few freight cars would have placed the caboose north of the block signal and the oil and water columns, eliminating the obstruc-

[4]Under the circumstances of this case it is not necessary to consider whether the jury was instructed concerning this presumption. It is a part of the law applicable to the case, like the provisions of the Federal Employers' Liability Act itself (*Grand Trunk Western Ry. Co.* v. *Lindsay*, 233 U.S. 42, 48 [34 S.Ct. 581, 58 L.Ed. 838, Ann.Cas. 1914C 168]; see note in Ann.Cas. 1914C 171) and administrative regulations issued under sanction of the Federal Boiler Inspection Act (*Lilly* v. *Grand Trunk Western R. Co.*, 317 U.S. 481, 488-489 [63 S.Ct. 347, 87 L.Ed. 411]).

"Especially when, as here," said the court in the Lilly case, "the rule only fortifies a result which we think the jury could probably have reached even in the absence of such a rule"; a statement equally apt in the instant case.

tions to vision and making it unnecessary for either of the brakemen to step near or onto the main line track. Or, the jury may have considered it unreasonable to require that the brake test signal be given on the right instead of the left side of Second 620, in the situation which obtained on this occasion. We infer from some of the evidence that it is customary to give such a signal on the right side of the train because the engineer is on that side. But on this occasion the signal had to be relayed to him through two brakemen. If given on the left side of the train, it would be relayed to him through two brakemen and the fireman. Such a procedure in this case would have avoided the obstructions to vision afforded by the block signal and the columns, and the exposure of Miller to the hazards of a fast moving streamliner. The track to the left of Miller's train was occupied by the first section of 620. The latter would not leave until after First 11 had passed by. If First 620 should start to move before the giving of the Second 620 brake test signal, it would not attain any considerable speed before it had cleared the head end of Miller's train.

These are factors quite within the competency and province of the jury to consider and weigh in ascertaining and determining whether defendant was negligent and, if negligent, whether Miller's injury and death proximately resulted therefrom, and the further question whether Miller's injury resulted in part from his negligence, if any.

We conclude that the evidence supports the implied finding that defendant was negligent and that such negligence was the sole cause of Miller's injury.

This analysis finds precedent and support, if any be needed, in *Bailey* v. *Central Vermont Ry.*, 319 U.S. 350 [63 S.Ct. 1062, 87 L.Ed. 1444]. Bailey was injured during the unloading of a hopper car filled with cinders. The car was pulled onto a bridge over a cattle pass so that the cinders could be dumped through the ties in the bridge floor onto the roadway 18 feet below. The only footing at the side of the car was about 12 inches wide, 8 or 9 inches of which were taken up by a raised stringer. There was no guardrail. The doors in the floor of the car are opened from the side by a man turning a nut on the end of a shaft by means of a wrench while another man disengages from a ratchet a dog which holds the shaft. When the doors start to open the shaft spins and the operator of the wrench must let go of it lest he be thrown off balance or knocked down. Upon this occasion

Bailey operated the wrench, the shaft spun, and he was thrown onto the roadway below.

The hopper car could have been opened before it was moved onto the bridge. Any cinders which spilled on the roadbed could have been shoveled onto the roadway beneath the bridge or a railroad tie could have been used to push the cinders from the roadbed to the ground below the bridge.

A motion by the defendant for a directed verdict was denied. Upon appeal the judgment was reversed by the state Supreme Court upon the ground that negligence was not shown.

The Supreme Court of the United States took a different view. "The nature of the task which Bailey undertook, the hazards which it entailed, the effort which it required, the kind of footing he had, the space in which he could stand, the absence of a guardrail, the height of the bridge above the ground, the fact that the car could have been opened or unloaded near the bridge on level ground—all these were facts and circumstances for the jury to weigh and appraise in determining whether respondent in furnishing Bailey with that particular place in which to perform the task was negligent. The debatable quality of that issue, the fact that fairminded men might reach different conclusions, emphasize the appropriateness of leaving the question to the jury. The jury is the tribunal under our legal system to decide that type of issue (*Tiller* v. *Atlantic Coast Line R. Co., supra*) as well as issues involving controverted evidence. *Jones* v. *East Tennessee, V. & G. R. Co.*, 128 U.S. 443, 445 [9 S.Ct. 118, 32 L.Ed. 478]; *Washington & Georgetown R. Co.* v. *McDade*, 135 U.S. 554, 572 [10 S.Ct. 1044, 34 L.Ed. 235]. To withdraw such a question from the jury is to usurp its functions.[5]

"The right to trial by jury is 'a basic and fundamental feature of our system of federal jurisprudence.' *Jacob* v. *New York City*, 315 U.S. 752 [62 S.Ct. 854, 86 L.Ed. 1166]. It is part and parcel of the remedy afforded railroad workers under the Employers Liability Act. Reasonable care and cause and effect are as elusive here as in other fields. But the jury has been chosen as the appropriate tribunal to apply

[5]See, also, *Ellis* v. *Union Pacific R. Co.*, 329 U.S. 649 [67 S.Ct. 598, 91 L.Ed. 572], in which the petitioner with other members of his crew was engaged in backing an engine around a curve on a spur track where visibility was obstructed by a building located on the inside and near the middle of the curve. He was standing on the ground on the same side as the building and to the right of the engine, and was controlling operations by hand signals to the engineer.

those standards to the facts of these personal injuries. That method of determining the liability of the carriers and of placing on them the cost of these industrial accidents may be crude, archaic, and expensive as compared with the more modern systems of workmen's compensation. But however inefficient and backward it may be, it is the system which Congress has provided. To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them.'' (Pp. 353-354 of 319 U.S.)

■ The Bailey decision furnishes the answer to defendant's contention, based upon earlier cases, that a jury is not competent, without the aid of expert testimony, to consider and determine whether or not a railway company has been negligent in the planning, construction or use of its facilities; at least, insofar as those factors are involved in the instant case.

■ Defendant invokes a number of the earlier cases which enunciate a rule or principle that a jury must not speculate when drawing inferences from probative facts, cases which made a severely restrictive application of that principle. The answer, in our case, is furnished by the following clear and cogent statement of the Supreme Court in the recent case of *Lavender* v. *Kurn* (1946), 327 U.S. 645 [66 S.Ct. 740, 90 L.Ed. 916] : "It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." (P. 744 of 66 S.Ct.) That principle, as thus defined, applies here.

■ (2) *In ascertaining whether or not the amount of damages awarded was excessive,* there are two principal elements to consider: (a) damages ''for the benefit of the surviving widow . . . and children'' of the employee (45 U.S.

Code 51), and (b) damages accorded by "Any right of action" given the injured employee by this statute, a right of action which survives "for the benefit of the surviving widow . . . and children" of such employee (45 U.S. Code 59).

We do not know how much the jury awarded for either of these two types of damages. Their award was in a lump sum, $80,032.50. Defendant divides this into two amounts: $60,032.50 to the widow and children for loss of support and $20,000 for conscious pain and suffering of the deceased. Before we consider the propriety of such a division of the award, let us take a look at the facts which bear significantly upon the issue of damages and the several elements of compensable injury in this case.

Miller died at the age of 37, with a life expectancy of 30.35 years. He was earning $4,200 a year. He had expenses of $900 to $1,000 a year applicable only to himself, while away on the road. He left surviving him his widow and four children (three sons and one daughter) of the ages of 12, 9, 7 and 6, respectively.

The defendant took $250 per month as Miller's contribution to the widow and children. Its expert computed the present value of this amount, upon a 3 per cent basis, at $60,032.50.

There was no proof of special circumstances indicating that any of the children would be a dependent after attaining his majority. Defendant would pare this item of $60,032.50 down to $39,755 upon the theory that an aliquot part of the $3,000 per year should be credited to Miller and that his share would increase proportionately as each child in turn attained 21 years. Upon this basis, the widow and children would be credited with 5/6 of $3,000 each year for the first nine years, 4/5 during the next three years, 3/4 for the next two, 2/3 during the year following. Thereafter, during the remainder of Miller's life expectancy, none of the children would benefit and the widow would be credited with but half of the $3,000 per year.

Defendant does not treat of the evidence which bears upon the care, attention, instruction, training, advice, and guidance which Miller could reasonably be expected to give his children had he lived. These are proper elements of pecuniary loss to them and are recoverable as such. Evidence of his ability and interest in training and guiding his children is proper and significant to show the value of that loss. (*Mobile & O. R. Co.* v. *Williams* (1933), 226 Ala. 541 [147 So. 819],

cert. den. 290 U.S. 655 [54 S.Ct. 71, 78 L.Ed. 568]. See, also, 74 A.L.R. 11, at 93-116, including 96 and 101-102.) Miller was greatly interested in his job as a railroad man. In addition he had done some writing and some of his writings had been published. He was a devoted father to his children and took an interest in their school work and in their training. He was interested in their athletic progress, helped a good deal with their work at school and in addition instructed them in outdoor living, fishing and camping. He was a committeeman with the Boy Scouts and helped out at meetings whenever he could. We do not know how much the jury awarded for the children's loss of their father's care, attention, instruction, training, advice, and guidance. It well may have been a very substantial sum.

Concerning Miller's conscious pain and suffering, the jury had before it the testimony of Newton that Miller was unconscious when found, but regained consciousness and when he left in the ambulance he had been conscious, groaning, and in great pain for about 20 minutes. There is no evidence concerning his condition thereafter, except that he died at 7:45 a.m. of that day. Because of such lack, defendant argues that the jury had before it evidence of but 20 minutes of conscious pain and suffering; hence, under the rule of no recovery when injury and death are substantially simultaneous, defendant says there can be no recovery. It is not that simple. A person in great pain and suffering can live a veritable lifetime in but a brief interval. A 20-minute period of great pain and suffering is not to be shrugged off as infinitesimal, too minute for the law to count or to care. Moreover, the jury was entitled to infer, quite reasonably we believe, that Miller continued to suffer for an appreciable period, perhaps until he arrived at the hospital, perhaps until the very moment of death. We could not undertake to substitute our judgment for that of the jury and the trial court that $20,000 was not excessive compensation for Miller's conscious pain and suffering even if we were to assume, as does the defendant, that the jury awarded that amount for that purpose.

By the process of reasoning described,[6] defendant

---

[6]Our use of defendant's breakdown and analysis of the lump sum award is no indication that we deem it legally proper to make the various assumptions involved; e.g., the assumption that the jury awarded $20,000 for Miller's pain and suffering and $60,032.50 for the support of his widow and children. We have used that method and those figures merely by way of illustration and as a convenient vehicle of discussion supplied by the defendant.

would account for $60,000 of the lump sum award of $80,000. The difference, $20,000, readily could be accounted for as the award to Miller's children for the loss of their father's care, attention, instruction, training, advice and guidance; not an excessive amount for four children ranging from 6 to 12 years, bereft of a father who loved them, took a tender interest in them, and possessed the personal qualifications this father exhibited, to lead and guide them throughout the years of their development into the full flower of manhood and womanhood.

We conclude that the damages fixed herein by the jury and approved by the trial court, when it denied a new trial, are not disproportionate to any reasonable limit of compensation, certainly not so disproportionate as to indicate that the award was the result of passion, prejudice, or corruption on the part of the triers of the facts. Peculiarly apt are the words of the Supreme Court of this state in the recent case of *Ericksen* v. *Southern Pac. Co.,* 39 Cal.2d 374, at 382 [246 P.2d 642]: "The claim that the verdict was excessive was passed upon and rejected by the trial court on the motion for a new trial. The amount of damages fixed by the jury and thereafter approved by the trial court will not be disturbed on appeal unless the evidence shows that the award is so disproportionate to any reasonable limit of compensation as to indicate that it was the result of passion, prejudice, or corruption on the part of the triers of the facts." (See, also, *Sherman* v. *Southern Pac. Co.,* 34 Cal.App.2d 490, 499-500 [93 P.2d 812], hearing by state Supreme Court denied, cert. by U.S. Supreme Court denied 309 U.S. 669 [84 L.Ed. 1015]; *Fritz* v. *Pennsylvania R. Co.,* 185 F.2d 31, 36-37, $70,000 award, deceased railway yard conductor aged 32, life expectancy 36 years, widow aged 29, two children of 9 and 6 years respectively; and *Affolder* v. *New York C. & St. L. R. Co.,* 339 U.S. 96, 101 [70 S.Ct. 509, 511, 94 L.Ed. 683], judgment of $80,000 for yard worker's loss of a leg deemed "not monstrous in the circumstances of this case.")

The judgment and the order appealed from are affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied May 29, 1953, and appellant's petition for a hearing by the Supreme Court was denied June 18, 1953. Schauer, J., and Spence, J., were of the opinion that the petition should be granted.