(No. 33394.—

RUTH ELAINE ALLENDORF, Admx., Appellee, *vs.* ELGIN, JOLIET AND EASTERN RAILWAY COMPANY, Appellant.

*Opinion filed March 22, 1956.*

166

Klingbiel, J., dissenting.

Stevenson, Conaghan, Velde & Hackbert, of Chicago, (Harlan L. Hackbert, of counsel,) for appellant.

William H. DeParcq, and Robert J. Martineau, of Chicago, (Charles Alan Wright, of counsel,) for appellee.

Mr. Justice Bristow delivered the opinion of the court:

James Allendorf, an Indiana resident, was killed on March 3, 1952, while performing his duties as switch foreman in the defendant's railroad yards at Gary, Indiana. Thereafter, his wife, Ruth Allendorf, filed this action in the circuit court of Cook County, as special administratix, to recover damages under the provisions of the Federal Employers' Liability Act. (45 U.S.C.A. sec. 51-59.) Trial was had by a jury, which, in addition to returning special findings as to negligence which were favorable to the plaintiff, also rendered a verdict for her in the amount of $127,500. After judgment was entered thereon, the defendant filed motions in arrest of judgment, for judgment notwithstanding the verdict, and for a new trial. As a basis for the former, it was contended that section 2 of the Injuries Act (Ill. Rev. Stat. 1951, chap. 70, par. 2,) precludes Illinois courts from assuming jurisdiction of a wrongful death action arising in a sister State. In opposition thereto, plaintiff argued that the statute, insofar as it so provided, was in conflict with the supremacy clause of article VI of the United States constitution, and was

therefore unconstitutional. The defendant's motions were subsequently denied and direct appeal has been taken to this court. In addition to the constitutional issue presented, the defendant contends that the verdict was not properly supported by the evidence and that the trial court erred in allowing certain actuarial testimony.

We must first decide whether the courts of Illinois have the power to entertain a cause of action for a wrongful death occurring outside of this State. Section 2 of our Injuries Act, after placing certain limitations upon the right of recovery, continues: "Provided, further, that no action shall be brought or prosecuted in this State to recover damages for a death occurring outside of this State where a right of action for such death exists under the laws of the place where such death occurred and service of process in such suit may be had upon the defendant in such place."

This proviso prohibits actions where the wrongful act occurred outside this State. (*Crane* v. *Chicago and Western Indiana Railroad Co.* 233 Ill. 259.) Thus, if not in conflict with the United States constitution, it bars the present action.

In *Hughes* v. *Fetter,* 341 U.S. 609, 95 L. ed. 1212, an action had been brought in Wisconsin to recover for a wrongful death occurring in Illinois but had been dismissed because the laws of Wisconsin refused to recognize such out-of-State actions. The Supreme Court of the United States, in holding that Wisconsin must give full faith and credit to the Illinois statute, said: "That State [Wisconsin] has no real feeling of antagonism against wrongful death suits in general. To the contrary, a forum is regularly provided for cases of this nature, the exclusionary rule extending only so far as to bar actions for death not caused locally." The court reiterated this principle by holding that a Federal court, sitting in Illinois, could not refuse to entertain an action based upon the wrongful death statute of Utah.

(*First National Bank of Chicago* v. *United Air Lines,* 342 U.S. 396, 96 L. ed. 441.) In its opinion, the court said that Illinois had not met constitutional requirements in permitting such actions to be brought only if the defendant could not be served in the State where the cause arose.

It is clear that a State can no longer refuse to entertain wrongful death actions which originate under the laws of a sister State, if, like Illinois, it entertains such actions when they arise under its own laws. Section 2 of our Injuries Act has thus been limited to apply only to suits arising under the laws of the United States or of a foreign country. As a practical matter, this means that it applies only to cases arising under the laws of the United States. But it has also been held that a State cannot discriminate against rights which arise under Federal law, as does the right in this case. (*McKnett* v. *St. Louis and San Francisco Railway Co.* 292 U.S. 230, 78 L. ed. 1227.) In effect, therefore, we have here the problem that was presented in the *McKnett case.* There, by the language of the statute, cases arising under a Federal statute were excluded. Here, by the interplay of judicial decisions, instead of the direct language of the statute, the same discrimination results. "A statute valid when enacted, may become invalid by change in the conditions to which it is applied." *Nashville, Chattanooga & St. Louis Railway Co.* v. *Walters,* 294 U.S. 405, 414. We hold, therefore, that insofar as section 2 of the Injuries Act prevents the bringing of actions within this State to recover damages for wrongful acts resulting in death committed without the State, it is contrary to article VI of the United States constitution.

The defendant next contends that the verdict was not properly supported by the evidence. In order to decide this question we must first look to the facts of the case. James Allendorf, the decedent, reported for work at 11:00 P.M. on the night of March 2, 1952, for a normal eight-hour shift, and was assigned as foreman of a switching

crew in the defendant's general classification yard at Gary, Indiana. In addition to the foreman, the crew consisted of an engineer and fireman, who were stationed in the engine, a field man and a head man. It was the crew's duty to arrange the railroad cars in proper order for their delivery to neighboring industries. To do this it was necessary to go into various tracks located in an area known as the "F" Yard and pull out cars and place them on other tracks. Prior to the accident, the Allendorf crew was working on the track known as the "F" Yard lead, which ran approximately in an east and west direction. Immediately to the north was the "L" Yard lead which ran parallel to and was approximately twelve feet from the "F" Yard lead. Between these tracks were various switch stands, which controlled the movements into the various tracks, and at the far westerly end was located a floodlight tower. Allendorf's engine was at all times during the course of the evening headed in a westerly direction. Since it was necessary for him to pass signals to his engineer, Allendorf normally stood between the "F" and "L" Yard leads. During the same night, a crew, under the supervision of Francis Fay, was assigned similar duties in the "N" Yard. However, at approximately 2:30 A.M., the Fay crew was sent over to the "L" Yard to remove defective cars from a train that had already been made up. Their job was to "kick" the defective cars down the "L" Yard lead into a different track. Since their engine was also headed in a westerly direction, the Fay crew worked on the north side of the "L" Yard lead. Thus, only the Allendorf crew was located between the "F" and "L" Yard leads. The engines used by both crews were diesel operated, were equipped with both headlights and back-up lights, and could travel with equal ease in either direction. The head man on Allendorf's crew testified that immediately before the accident a mistake had been made by him and certain cars were placed on the wrong track. He and

Allendorf had discussed the matter at approximately 3:00 A.M. while standing in the center between the two lead tracks "L" and "F," and as he walked away he turned to see Allendorf's lantern go down. It was later shown that Allendorf had been struck by the defective cars being kicked down the "L" Yard lead. Others stated that after this conversation, they saw Allendorf's lantern move a step or two and then fall. The head man further testified that he immediately climbed upon the "F" lead cars and looked in a westerly direction, hoping to see the engine that had shoved the defective cars, but that he saw neither an engine nor its back-up light. Nussle, the engineer in Allendorf's crew, testified that although he was looking in a westerly direction before the accident, he did not know an engine was working on the "L" Yard lead nor did he see any back-up light. However, both the engineer and fireman of the Fay crew testified that the headlights and back-up lights of their engine were on at all times prior to the accident. There was much conflicting evidence as to whether Allendorf knew that another crew was working on the adjoining "L" Yard lead. Fay, the "L" Yard foreman, stated that he had told his field man to warn the Allendorf crew of the impending movement on the "L" Yard lead. The field man stated he had told a member of the Allendorf crew, but not Allendorf himself. The yard-master swore that at about 2:30 A.M. he informed Allendorf that the Fay crew would be kicking cars down the "L" Yard lead. He further testified that later he warned the Allendorf crew by loudspeaker. This was not verified by any member of the crew. The evidence was also extremely conflicting as to the degree of lighting in the accident area. It did show, however, that although the cars which struck Allendorf were neither lighted nor accompanied by any member of the switching crew, such was the usual custom in such operations. Other testimony showed that after allowing for the car overhang, the work-

ing distance between the "F" and "L" Yard leads was approximately six and one-half feet.

In order to recover under the Federal Employers' Liability Act it is necessary to prove that the defendant was negligent and that such negligence was the proximate cause of the accident, in whole or in part. (*Tennant* v. *Peoria and Pekin Union Railroad Co.* 321 U.S. 29, 88 L. ed 520.) The plaintiff contended and the jury specifically found that the defendant did not warn the decedent of the intended movement of cars on "L" Yard lead, that the rear light on the Fay engine was not lighted prior to and at the time of the accident, and that the decedent was not himself guilty of negligence. In her complaint the plaintiff had also alleged that the area was improperly lighted and that the defendant had failed to furnish a safe place to work.

Judges are not free to reweigh the evidence and set aside the jury verdict merely because they, as individuals, might have arrived at different conclusions. (*Tennant* v. *Peoria and Pekin Union Railroad Co.* 321 U.S. 29, 88 L. ed. 520.) Only where there is a complete absence of probative facts to support the conclusion reached, does reversible error appear. (*Starck* v. *Chicago and North Western Railway Co.* 4 Ill. 2d. 616; *Bonnier* v. *Chicago, Burlington & Quincy Railroad Co.* 2 Ill. 2d 606; *Wetherbee* v. *Elgin, Joliet and Eastern Railroad Co.* 191 Fed. 2d 302.) As the court said in *Lavender* v. *Kurn,* 327 U.S. 645, 90 L. ed. 916: "But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the Appellate Court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." Although the evidence in this case is, upon some points, conflicting, we cannot say as a matter of law that the verdict was not properly supported by the evidence. After

considering the record as a whole, we are of the opinion that there was sufficient evidence presented from which a jury could reasonably conclude that the defendant was guilty of the negligence charged and that such negligence was the proximate cause of the decedent's death.

Defendant further contends that the court erred in admitting in evidence the actuary's calculations of plaintiff's projected pecuniary loss, and that since the verdict of the jury closely approximated the sum suggested by the actuary, that testimony was misleading and warrants reversal of the cause.

Although actuarial calculations were presented in a death case under the Federal Employer's Liability Act in *Starck* v. *Chicago and North Western Railway Co.* 4 Ill. 2d 611, the propriety of that evidence was contested only in a limited respect.

Elizabeth Young, the actuary, is an expert in actuarial work, having specialized in actuarial science at the University of Iowa where she received a degree in that branch of education, and, further, had twenty-four years experience as a consulting actuary. Let us examine her testimony rather fully. On direct examination it was assumed that decedent had a gross income in 1951 of $5542.70, and subtracting from that sum income tax deductions and $50 per month for his personal expenses would leave a net average monthly balance of $378.09. Then Miss Young testified that she had determined the present cash value of future lost monthly contributions of $378.09 over a period of 38 years and 8 months, discounted at 2½ per cent and at 3 per cent, using the compound discount tables in making her calculations. It was assumed that the $378.09 was the amount that the dependents of the deceased would have received each month had he lived and continued to be employed with the same income.

Over objection Miss Young testified that the present value of such amount for such a period at 2½ per cent

is $112,904.37 and for 3 per cent the value would be $104,418.69. She further testified that the present value of $1 per month payable at the end of each month for 38 years and 8 months, assuming an interest rate of 3 per cent, is $276.17416. If this sum is multiplied by $378.09, you will have again the sum of $112,904.37. Defendant argues that by the actuary predicating her ultimate results upon a specific sum of $378.09 and for the definite period of 464 months it was tantamount to adding probative value to those figures, thus invading the province of the jury.

It is agreed that it was not within the province of the actuary to testify that the plaintiffs have been deprived of a monthly contribution of $378.09, nor was it within her province to say how long any contribution might continue. If the witness had been asked to quote the value of $1 per month payable at the end of each month for periods of ten, twenty, thirty, forty years, then the jury with the assistance of counsel could project that figure into the future, for however long a period the jury should determine. The salient vice of the challenged testimony is implicit in the likelihood that the jury interpreted the actuary's presentation as testimony that decedent would continue to work as a switchman for 38 years and 8 months and that his earnings would remain at $5500 per year and that his dependents would receive from him $378.09 per month for that period.

The damage issue cannot be resolved without a consideration of the instructions given to the jury on that subject.

Instruction No. 12 reads as follows: "The jury is instructed that certain mortality tables were received in evidence tending to show the life expectancy of the deceased and of the plaintiff. These tables are not conclusive and are not binding upon you. The deceased may have died before his expectancy of life was reached, and on the other hand he may have lived longer than his expectancy. The

plaintiff may die before her expectancy has been reached or she may live longer than her expectancy. These tables were received as an aid to the jury in determining the probable expectancy of life of the deceased and of the plaintiff, and you are to give them such weight as you find they are entitled to receive in the light of your common sense and experience. The expectancy of life should not be used as a factor by multiplying the years of expectancy by the annual earnings. The award of damages for the loss of future contributions must be reduced to its present cash value and adequate allowance must be made for the earning power of money. You are entitled to consider all factors or circumstances which might tend to increase or decrease the pecuniary loss."

Instruction No. 17: "The jury is instructed that if you find the plaintiff is entitled to recover from the defendant in this action, that then the plaintiff is entitled to recover such damages as will justly and adequately compensate her and the surviving dependent children of the deceased for the pecuniary loss, past and future, sustained by them on account of his death. In assessing damages, if any, and in determining the pecuniary loss of the widow and minor children, you may take into consideration the age of the widow and minor children, the age of the deceased, the probable expectancy of life of deceased and his widow, his health, his employment, and the amount of money which you find from the preponderance or greater weight of the evidence that it is reasonably certain he would have contributed to his wife in the future and to the children during their minority. In determining the amount of damages, if any, to be awarded for loss of future financial contribution to the widow and children, you are instructed that you are to determine the present cash value of such future lost contributions. The jury is instructed that if you find from a preponderance or greater weight of the evidence and with

reasonable certainty that the deceased would have rendered services of a pecuniary or financial value to the plaintiff in the future and to her children during their minority, and if you further find that the plaintiff has established with reasonable certainty that she and her children have been deprived of the benefits of such future services by reason of the death of deceased, then you are at liberty to take into consideration and award fair and just compensation for such services, including counsel, training and guidance, that the minor children of deceased would have received from him during their minority. The present cash value of the benefits of which the widow and children have been deprived on account of the death of deceased, making adequate allowance for the earning power of money, is the proper measure of recovery."

Instruction No. 27 was as follows: "You are instructed that any award made to plaintiff as damages in this case, if any award is made, is not subject to Federal income taxes, and you should not consider any Federal or state income taxes in fixing the amount of any award made plaintiff, if any you make."

Instruction No. 29: "You are instructed in estimating the present cash value of any future loss of contributions, you should also consider the fact that all persons do not live to the age of expectancy, and this is particularly true in the case of hazardous occupations such as that of railroading; that they may not work during all the years of their life; that their earnings may not remain stationary and that the reasonably to be expected earnings may not remain stationary and that the reasonably to be expected earnings may vary or diminish in the future."

Instruction No. 30: "The jury is instructed that the burden of proving the amount of damages that plaintiff may recover is upon the plaintiff and that she must establish the amount of damages by a preponderance or greater weight

of the evidence, and with respect to future damages, she must establish the same by a preponderance or greater weight of the evidence to a reasonable certainty."

It is contended here that since the jury's verdict so closely approximated the projected result reached by the actuary, that the jury of necessity relied upon the two factors, namely, $378 per month and 38 years and 8 months, as established by the evidence; that by so doing the jury failed to take into consideration many uncertainties in life, namely, that decedent might not have lived 38 years, nor continued to be employed for that period, nor received the same pay throughout, that payments to his dependents would not remain the same after his children became of age, that his personal expenses might exceed $50 per month, etc.

In *Turrietta* v. *Wyche*, 54 N.M. 5, 212 P.2d 1041, 15 A.L.R.2d 407, the plaintiff sustained the loss of an arm. The court said this at p. 417: "It may be that such testimony is speculative, as asserted by defendant; but no more so than any that has for its purpose the proof of future action or events. It is all problematical at best. It is not questioned that mortality tables are admissible, but possibly not one time in fifty would the life expectancy of any individual come within a year of the actual length of his life. It is, to say the least, problematical whether he would continue to live, continue in health, continue to work, continue to work with much the same effort and ability he has shown in the past, continue to have the desire and the opportunity to work. Also, that the amount of wages paid him and those following his occupation generally in the past, will continue to be paid; that the wage scale will not be materially affected by depression, strikes, inflation, or war; that interest rates will remain much as they are. However 'speculative' such testimony may be, it is the best that can be produced to establish earning capacity over a period of years. A jury of twelve average citizens ordinarily can be depended on to assess damages fairly, after they have heard and considered

such evidence. The trial court did not err in admitting in evidence the testimony tending to prove plaintiff's earning capacity. The annuity tables were admissible in evidence to show present values of wages that might have been earned over a period of time, equal to plaintiff's life expectancy. This court has so held. *Johnson* v. *Santa Fe*, 35 N.M. 77, 290 P. 793; *Mares* v. *New Mexico Public Service Co.* 42 N.M. 473, 82 P.2d. 257; *Chesapeake & Ohio R. Co.* v. *Kelly*, 241 U.S. 485, 36 S. Ct. 630, 60 L. ed. 1117, L.R.A. 1917F, 367; *Chase* v. *Fitzgerald*, [132 Conn. 461, 45 A.2d 789, 163 A.L.R. 247,] supra."

The use of annuity tables has received legislative and judicial sanction: Vernon's Annotated Missouri Statutes, 442.530, Vol. 23, p. 30; *Peters* v. *Kansas City Railways Co.*, 204 Mo. App. 197, 224 S.W. 25; Wisconsin Statutes (1933), sec. 314.06; Code of Alabama 1953 (enacted Aug. 31, 1953), chap. 11, sec. 277; North Carolina Consolidated Statutes (1919), secs. 1790 and 1791; *Vicksburg and Meridian Railway Co.* v. *Putnam*, 118 U.S. 545; *Groat* v. *Walkup Drayage & Warehouse Co.* 14 Cal. App.2d 350, 58 P.2d 200; *Colusa Parrot Mining & Smelting Co.* v. *Monahan*, 162 Fed. 276, 282 (9th Cir., 1908); Sutherland on Damages, (4th ed.) vol. 2, sec. 455, p. 1476.

To allow an actuary to testify to figures, which the jury might adopt as real, carries with it the danger that the jury will accept them not only as the actuary's explanation of his process of computation, but also as proof of contribution and life and work expectancy. Anticipating this very danger, the defendant caused the jury to be instructed that the actuary's testimony was not to be so interpreted. And on cross-examination of Miss Young, it was thoroughly developed that she did not mean to be saying what amount in dollars the plaintiffs would have received had decedent lived, nor for what period of time they would have received the same.

We are of the opinion that the proper method of assist-

ing a jury in making damage calculations is for the actuary to use neutral figures. In the usual situation where hypothetical inquiries are permissible, it is necessary that the expert assume a factual situation as reflected in the proof in order to insure that his testimony bears upon the issue to be determined. The actuary, however, is called upon only to describe to the jury a mathematical process that will simplify the jury's task of determining the present value of the contribution that plaintiffs would have received had decedent not been killed. To accomplish that purpose it is not necessary that he use figures that correspond with those appearing in evidence, and when he does so there is a danger that the jury may be misled. Once the formula is before the jury, its application to the facts of the case is a matter for argument of counsel.

It is the contention of the appellant here that Miss Young's testimony was prejudicial because her calculations were predicated upon the figure $378.09 which was in violation of the rule laid down by the United States Supreme Court in the case of *Kansas City Railroad Co.* v. *Leslie,* 238 U.S. 599. Therein it was held that the decedent's contributions to his family are not to be determined by deducting from his gross income an arbitrary amount for his personal expenses. The unchallenged testimony is that Allendorf cashed his pay checks and turned the proceeds over to his wife. He was given an allowance of $50 per month for his personal expenses. Mrs. Allendorf was not cross-examined as to the arrangement. If $50 did not correctly reflect the amount of decedent's personal expenses, it was defendant's privilege to adduce proof to the contrary. Defendant argues that the amount spent on insurance premiums was not a contribution to Allendorf's dependents. The insurance was to go to his dependents upon his death and it gave them needed security to take care of such eventuality. In *Chicago and North Western Railway Co.*

v. *Curl,* 178 F.2d 497, 502, it was held that sums paid for railroad retirement are not to be deducted in computing plaintiff's probable earnings for purposes of an F.E.L.A. action.

As we have heretofore mentioned, the verdict of the jury was in excess of the highest figure given by the actuary. Appellee seeks to justify this result. Decedent was a young man 24 years of age—father of twin girls—and a third child was born posthumously. He was thrifty—frequently finding odd jobs in addition to his regular employment; he was handy with tools and a good workman, capable of making improvements and repairs around the home that they had just purchased. The record shows that decedent was a kind and faithful father. It has been repeatedly held that the jury may award damages for such intangibles as the foregoing because they relate to his earning power and his disposition to continue to contribute to the welfare of his family. In *Miller* v. *Southern Pacific Co.* 117 Cal. App.2d 492, 256 P.2d 603, 1955), a verdict of $80,000 was held not excessive even on the assumption that $60,000 covered the contributions and the pain and suffering for the twenty minutes decedent lived after his injuries. The court said that the other $20,000 could easily be accounted for as the jury's award to decedent's children for loss of the care and guidance of a father. The court said at page 613: "The difference, $20,000, readily could be accounted for as the award to Miller's children for the loss of their father's care, attention, instruction, training, advice and guidance; not an excessive amount for four children ranging from six to twelve years, bereft of a father who loved them, took a tender interest in them, and possessed the personal qualifications this father exhibited, to lead and guide them throughout the years of their development into the flower of womanhood and manhood." (*Norfolk and Western Railway Co.* v. *Holbrook,* 235 U.S. 625: *Giles*

v. *Great Western Railway Co.* 72 F. Supp. 493.) In the light of the reasoning found in the *Giles* and *Holbrook* cases we are of the opinion that it is unnecessary to undertake to prove the value of the financial loss of such care, etc., anymore than it would be necessary to prove the value of pain and suffering or of inconvenience and annoyance when they are elements of damages. The jury should assess the value of such loss in the exercise of their best judgment based upon the facts of each case. Another intangible element for which recovery is proper is services which the deceased husband may have performed about the home. (*Michigan Central Railway Co.* v. *Veerland,* 227 U.S. 59; *Alabama Great Southern Railway Co.* v. *Cornet,* 214 Ala. 23, 106 So. 242.) In the case of *Ward* v. *Denver & Rio Grande Western Railroad Co.* 96 Utah 564, 85 P.2d 837, the court stated: "The husband's services in the home often have a pecuniary value which would cost money to replace such as chores, marketing, and the like. In this case the evidence is the plaintiff and her husband had bought a little place eight miles out in the country where they had cows, chickens, pigs and a garden and raised alfalfa; that the deceased did the work attending to the pigs, chickens, etc., besides his railroad work and that when not on duty with the railroad he worked on the place, all this work has a pecuniary value."

Furthermore the record shows that the deceased was a young man, energetic and ambitious, and at the early age of 24 was earning $5500 per annum. It was within reasonable contemplation that as he progressed in life his earnings would increase. In computing the contributions that the next of kin can reasonably expect the jury may take into account the fact that the deceased was enterprising and industrious and had good prospects for advancement. (*Bartlebaugh* v. *Pennsylvania Railroad Co.* (Ohio A.) 78 N.E.2d 410.) Competent statistical data supports a common sense observation that a man so young with so large an income is

likely to continue to advance and to enjoy a substantially greater income in the future. See Fig. 4 in Dublin & Lotka, *The Money Value of a Man,* 65 (Rev. ed. 1946).

There are innumerable cases indicating that recovery is permissible for the full life expectancy even though the deceased might have retired at an earlier age. *New York, New Haven & Hartford Railroad Co.* v. *Zermani,* 200 F.2d 240; *Fritz* v. *Pennsylvania Railroad Co.* 185 F.2d 31; *Atlantic Coast Line Railroad Co.* v. *McKay,* 261 Ala. 66, 73 S.2d 85; *Louisville & Nashville Railroad Co.* v. *Young's Adm'x,* (Ky. App.) 253 S.W.2d 585; *Seibert* v *Litchfield & Madison Railway Co.* (Mo.) 159 S.W.2d 612, 618.

Appellee also points out that the testimony of the actuary was needlessly favorable to defendant. Since the trial of the instant case this court has held in *Hall* v. *Chicago and North Western Railway Co.* 5 Ill.2d 135, "that the incident of taxation is not a proper factor for a jury's consideration, imparted either by oral argument or written instruction. It introduces an extraneous subject, giving rise to conjecture and speculation." The trial court required the actuary to consider present value of future contributions after deduction of income tax. Plaintiff's attorney acquiesced in this ruling as well as the giving of instruction No. 27. The estimate of the actuary, by deducting income tax, was more than $10,000 less than it would be without such deduction. Furthermore, the actuary's testimony was based upon future net earnings until the time decedent would have become 65 years of age. According to one mortality table Allendorf's expectancy was 68.21 years. The age of 65 was used because it is the normal age for railroad retirement. Thus plaintiffs unnecessarily limited their recovery by asking for computation only until age 65.

Both parties herein, in their briefs, seek comfort in the case of *Wetherbee* v. *Elgin, Joliet & Eastern Railroad Co.* 191 F.2d 302, but we find it of little value in resolving the problem before us. Therein the court observed that in

its opinion an award of $80,000 was excessive and then expressed alarm at the large verdicts currently appearing, and, finding itself powerless to reverse the case because of the large verdict, proceeded to find a reason to accomplish the same result, and sought refuge in the rationale appearing in *Buchanan* v. *Chicago and North Western Railway Co.* 159 F.2d 576. At page 578 this appears: "However, the reviewing court can, if it thinks the verdict is not according to the weight of the evidence, scan the trial more closely for error." In its search for error the court determined that the jury had failed to follow the trial court's instructions that damages should be diminished in proportion to the amount of negligence attributable to the decedent, and for that reason alone reversed.

The foregoing considerations of the damage issue converge to this conclusion. Whatever evil might have appeared in the testimony of the actuary, to the prejudice of the defendant, is counterbalanced by the many other advantages as herein outlined. The ultimate question, of course, is not whether the trial was scrupulously free from error, but whether any error which occurred operated to the prejudice of the defendant. It is our opinion that the result in this case would have been no different even had the actuary employed neutral figures in her testimony. The defendant has been afforded a fair trial free of reversible error. The judgment is affirmed.

*Judgment affirmed.*

Mr. JUSTICE KLINGBIEL, dissenting:

I cannot accept the conclusion of the majority that section 2 of our Injuries Act contravenes article VI of the United States constitution.

The relevant provision of that article is the supremacy clause, which says that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the

Authority of the United States, shall be the supreme Law of the Land." (Ill. Rev. Stat. 1955, p. 4.) The present decision is thought to be required by the rule that "When a state refuses to hear pleas based on federally created rights while it takes cognizance of those created by state law, there may be invalid discrimination because by the Supremacy Clause federal laws are made laws of the state." *United States* v. *Burnison,* 339 U.S. 87, 94, 94 L. ed. 675, 682.

The court relies on three United States Supreme Court decisions. In *Hughes* v. *Fetter,* 341 U.S. 609, 95 L. ed 1212, and *First National Bank of Chicago* v. *United Air Lines,* 342 U.S. 396, 96 L. ed. 441, the local action was based on the wrongful death statute of another State, and the issue was whether the full-faith-and-credit clause of article IV requires recognition of a foreign cause of action when the law of the forum, on the particular facts, is in conflict with that of the foreign State. In the remaining case, *McKnett* v. *St. Louis & San Francisco Railway Co.* 292 U.S. 230, 78 L. ed. 1227, an action under the Federal Employers' Liability Act was brought in Alabama to recover damages for an injury inflicted in Tennessee by a foreign railroad. Under former Alabama law the courts had no jurisdiction of a suit against a foreign corporation unless the cause of action arose within the State. An Alabama statute of 1907 had restored jurisdiction as to causes of action arising under the law of another State, but left the proscription in effect as to causes of action arising under Federal law. It was held that the constitution prohibits State courts of general jurisdiction from declining jurisdiction solely because the suit is brought under a Federal law. The discrimination, it will be observed, occurred through the election by the State of Alabama to expressly permit an action of the same class to be maintained where it arose under the laws of another State. The decision was not that both must be recognized but that if one is voluntarily per-

mitted the other must be. The question presented to this court is whether the holding in *Hughes* v. *Fetter, compelling* Illinois to recognize a cause of action arising under the laws of another State, is equivalent to voluntary choice to do so. Is this State basing a denial of jurisdiction upon the source of law sought to be enforced? Has Illinois refused to provide a forum solely because the suit is brought under a federal law? Has Illinois "discriminated" against rights arising under federal laws? I think not.

We are foreclosed by *Hughes* v. *Fetter* from questioning whether the full-faith-and-credit clause was meant to give to a mere cause of action the dignity accorded to judgments and other acts of a public nature. As an original proposition it would seem that the law of a State may be given full faith and credit without going so far as to say that every private cause of action thereunder must be enforced in every other State. The constitutional provision establishes a rule of evidence rather than of jurisdiction; and even where a cause of action has been reduced to judgment in the foreign State the clause has been held not to be violated by a statute precluding the maintenance of an action between nonresidents where the cause of action arose outside the State. (*Anglo-American Provision Co.* v. *Davis Provision Co.* 191 U.S. 373, 48 L. ed. 225.) The provisions of the full-faith-and-credit clause, it has been said, do not affect the jurisdiction of the court in which a foreign judgment is offered in evidence. (*Wisconsin* v. *Pelican Ins. Co. of New Orleans,* 127 U.S. 265, 32 L. ed. 239, 244.) At least in the absence of implications created by *Hughes* v. *Fetter,* there are limits to the extent to which the policy of one State may be subordinated to the policy of another. (See *Milwaukee County* v. *White Co.* 296 U.S. 268, 273, 80 L. ed. 220, 225-226.) The extent to which the State of the forum shall apply in its own courts a rule of law of another State is itself a question of local law of the forum (see *Magnolia Petroleum Co.* v. *Hunt,* 320 U.S. 430, 445,

88 L. ed. 149, 158) ; and the distinction, as to full faith and credit, between foreign judgments and common or statutory law has long been recognized. 320 U.S. at 436, 88 L. ed. at 154.

But we are not obliged here to determine how far the full-faith-and-credit clause reaches. The source of Illinois's duty to enforce Federal rights is found, not in the full-faith-and-credit clause, but in the inherent characteristics of the Federal system. (*Mondou* v. *New York, New Haven & Hartford Railroad Co.* 223 U.S. 1, 57-58, 56 L. ed. 327, 349.) The grant of power to Congress by the constitution is paramount over all legislative powers reserved to the States, and where concurrent power exists that of the Federal government must prevail. But before a State law can be invalidated on such grounds it must appear (1) that the power in question is possessed by Congress and (2) that it has been exercised. Assuming a Federal power to prescribe jurisdictional requirements for Illinois courts as to the present subject matter (but cf. *Minneapolis & St. Louis Railroad Co.* v. *Bombolis,* 241 U.S. 211, 60 L. ed. 961; *Bowman* v. *Lewis,* 101 U.S. 22, 25 L. ed. 989, 993,) I cannot see where Congress has purported to exert it. If the Federal Employers' Liability Act had provided that all actions to enforce rights thereunder must be entertained in State courts, regardless of the place where the wrong occurred, then there would be a conflict between the two statutes; and if such a Federal requirement were valid, the supremacy clause would require the result reached by the court. But the Federal statute does not so provide. (Accord, *Douglas* v. *New York, New Haven & Hartford Railroad Co.* 279 U.S. 377, 387-388, 76 L. ed 747, 752.) It deals not with procedural questions but with substantive rights. There is no conflict on the jurisdictional question because Congress has not acted in the field. The opinion of the court does not even attempt to point out how such a command can be inferred from the language of the Fed-

eral Employers' Liability Act, nor can I find anything therein to indicate one. The rule is well established that where there exists a concurrent power of legislation in the States and in Congress, State power remains until the field is occupied by an exercise of the Federal power. It is unaffected by the mere existence of potential Federal action. (*Reagen* v. *Mercantile Trust Co.* 154 U.S. 413, 38 L. ed. 1028.) The constitutional requirement is that "any legislation of a state, although in pursuance of an acknowledged power reserved to it, *which conflicts with the actual exercise of the power of Congress* over the subject of commerce, must give way before the supremacy of the national authority." (Emphasis supplied.) (*Smith* v. *Alabama,* 124 U.S. 465, 473, 31 L. ed. 508, 510.) The proviso in the case at bar offends neither the full-faith-and-credit clause nor the supremacy clause.

Section 2 of our Injuries Act makes no distinction on the basis of the source of the law sought to be enforced. It says nothing, in fact, about the subject. It provides simply that no action can be brought here to recover damages for a death occurring elsewhere. At the time of its enactment and for 48 years thereafter it was never conceived that a State could not, upon rational considerations, decline to entertain these foreign causes of action, whether arising under the laws of another State or under the Federal Employers' Liability Act. (See *Douglas* v. *New York, New Haven & Hartford Railroad Co.* 279 U.S. 377, 387, 73 L. ed. 747, 752.) In the *McKnett case,* upon which the majority opinion is based, the court expressly recognized that "Congress has not attempted to compel states to provide courts for the enforcement of the Federal Employers' Liability Act." (See, also, *Mondou* v. *New York, New Haven & Hartford Railroad Co.* 223 U.S. 1, 56-57, 56 L. ed. 327, 349.) Yet this court, because of subsequent federal decisions construing the full-faith-and-credit clause to apply in cases of mere conflict of laws, now accom-

plishes the very thing which Congress has not even attempted.

It can hardly be doubted that section 2 of our Injuries Act was valid when enacted; that the rationale of *Hughes* v. *Fetter* does not operate to impair, *ab initio,* our injuries statute and the intermediate decisions sustaining its validity. (See *Great Northern Railway Co.* v. *Sunburst Oil & Refining Co.* 287 U.S. 358, 364-365, 77 L. ed. 360, 366-367.) Wherein, then, did Illinois "discriminate" against federal causes of action? Aid cannot be found in cryptic references to "the interplay of judicial decisions." The practical difference of treatment arose from the decision of the United States court in *Hughes* v. *Fetter,* not from action or choice by this State, whose statute makes no distinction whatever. Under such circumstances I think we would be warranted in giving effect to the statute in so far as its application is not limited by that decision.

Fifty years ago this court, in a well-reasoned opinion, concluded on similar facts that the proviso in question is valid, and that the circuit court had no jurisdiction. That decision, *Walton* v. *Pryor,* 276 Ill. 563, is now overruled because an "interplay of judicial decisions" has compelled our courts to take jurisdiction of actions arising under the laws of other states, and has prohibited a state from discriminating against actions arising under federal law. To continue applying the statute, except in so far as its application is precluded by the *Hughes* v. *Fetter* interpretation of the full-faith-and-credit clause, is not in my opinion a discrimination by Illinois. In effect the present holding amounts to an amendment of the federal statute to enlarge the jurisdiction of our courts, and an interpretation of the supremacy clause to require enforcement of the "amendment." Federal supremacy should not be stretched that far. I think some vitality still remains in the rule that "Each State, subject to restrictions of the Federal constitution, determines the limits of jurisdiction of its courts,

the character of the controversies which shall be heard in them, and how far its courts having jurisdiction of the parties shall hear and decide transitory actions where the cause of action has arisen outside of the State." *Wall* v. *Chesapeake & Ohio Railway Co.* 290 Ill. 227, 231.

The presumption is that the statute in the case at bar is valid. One who challenges its validity assumes the burden of showing, upon rational grounds, that it violates some constitutional provision. This burden, in my opinion, has not been satisfied here.