(No. 33332.—)

PAULINE B. STARCK, Admx., Appellee, *vs.* THE CHICAGO AND NORTH WESTERN RAILWAY COMPANY, Appellant.

*Opinion filed December 20, 1954—Rehearing denied Feb. 15, 1955.*

DRENNAN J. SLATER, and EDGAR VANNEMAN, JR., both of Chicago, for appellant.

ROBERT MARTINEAU, and WILLIAM H. DEPARCQ, both of Chicago, (WILLIAM C. WINES, of counsel,) for appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

Pauline B. Starck, administratrix of the estate of her husband, William Ernest Starck, deceased, brought this action under the Federal Employers' Liability Act in the municipal court of Evanston against the defendant, the Chicago and North Western Railway Company. Judgment was entered upon a verdict for plaintiff in the sum of $54,300. Defendant appeals directly to this court because a construction of the constitution and the validity of a statute are involved.

The defendant's first contention is that the municipal court of Evanston was without jurisdiction. The accident giving rise to the action occurred in Geneva, in Kane County; the decedent was a resident of West Chicago, in Du Page County, and so is the plaintiff; defendant is a Wisconsin corporation with its principal offices in Chicago. The attack upon the jurisdiction of the court is grounded upon section 1 of article VI of the constitution: "The judicial powers, except as in this article is otherwise provided, shall be vested in one supreme court, circuit courts, county courts, justices of the peace, police magistrates, and such courts as may be created by law in and for cities and incorporated towns." It is contended that the reference to courts "in and for cities and incorporated towns" precludes the General Assembly from establishing municipal or city courts "which can be resorted to by plaintiffs who do not reside in the city which established the court for a determination of causes of action arising out of transactions occurring far outside of the city."

In support of this position the defendant relies upon certain language in *Turnbaugh* v. *Dunlop,* 406 Ill. 573, as establishing a criterion of "benefit to the inhabitants of the city" as a limitation upon the jurisdiction which the legislature may confer on a municipal or city court. The question in the *Turnbaugh case* was the jurisdiction of the

city court of Moline over an action between two residents of that city which arose out of an occurrence which took place outside of the city. The language upon which the defendant relies was used in pointing out the incongruity, as applied to the facts of that case, of the argument that maintenance of the action would not benefit the city or its inhabitants. The decision of the court was, not, however, rested upon the narrow ground that both parties resided within the city. Rather the court there held that in the case of a transitory action, if there is jurisdiction over the defendant, "jurisdictional requirements have been satisfied regardless of where the acts were performed giving rise to liability. Whatever statements this court has heretofore made to the contrary effect are not the law of this State and are hereby expressly overruled." 406 Ill. at 585.

That there is no special significance in the constitutional reference to courts "in and for" cities was carefully pointed out in *United Biscuit Co.* v. *Voss Truck Lines, Inc.*, 407 Ill. 488, which involved the jurisdiction of the municipal court of Chicago over a transitory cause of action. We there also said: "The former holdings implying that the words 'arising in said city' were intended or implied in section 1 of article VI of the constitution, as applied to city courts, are overruled by the recent case of *Turnbaugh* v. *Dunlop,* 406 Ill. 573, and hence the cases containing this phrase have no weight in deciding this particular question." 407 Ill. at 499.

The decisions in the *Turnbaugh* and *United Biscuit Co. cases* were intended to put at rest the notion that a constitutional limitation upon the jurisdiction of municipal and city courts over transitory causes of action could be distilled from section 1 of article VI of the constitution. There is no language in that section which expressly prohibits the General Assembly from establishing municipal and city courts with jurisdiction over transitory actions, regardless of the residence of the parties, and we again

hold that no such prohibition is to be implied or inferred from the language which was used.

Defendant next attacks the validity of section 42 of the act in relation to municipal courts in cities and villages, (Ill. Rev. Stat. 1953, chap. 37, par. 495,) under which the jury in this case was impanelled. The sentence which is attacked was added to section 42 in 1935. It provides: "Whenever it may be found convenient, jurors summoned for service in any other court of record in the county may, with the consent of the judges presiding in said other court, or of the Judge acting as chief justice thereof, be impanelled for service in the trials of cases in the municipal court." It appears that the jurors in this case had been selected and summoned under the Jury Commissioners Act for service in the circuit court of Cook County; that the chief justice of the municipal court of Evanston had issued an order calling for the service of twenty-four jurors; that the bailiff had accordingly gone to the jury room of the circuit court of Cook County, where the names of jurors were drawn by lot out of the same hopper that was used for assignments in the circuit court, and that the jurors whose names were so drawn were then ordered to serve in the municipal court of Evanston.

By its challenge to the array defendant asserted that there had been a total failure to comply with the Jury Commissioners Act, and that section 42 violates section 13 of article IV of the constitution because it attempts to amend section 9 of the Jury Commissioners Act (Ill. Rev. Stat. 1953, chap. 78, par. 32,) without setting forth that section. This contention was overruled in the trial court and is renewed here.

Section 9 of the Jury Commissioners Act sets forth the procedure by which jurors are to be selected for service in courts of record in counties with a population of more than 140,000. It provides that one or more of the judges of each court of record of the county, or of municipalies

within the county, shall certify the number of petit jurors required each month and that the clerk shall go to the office of the jury commissioners where the necessary number of names shall be drawn by lot from the list already prepared by the commissioners. The clerk then certifies to the sheriff the names selected so that the jurors may be summoned.

Section 42 of the Municipal Court Act deals with the selection of petit jurors for service in municipal courts in cities and villages. The sentence already set forth, which was added in 1935, is preceded by the requirement that jurors for municipal courts shall be provided by the same agency and from the same lists as are jurors selected for service in the circuit court, and by a provision for payment of the expense of summoning jurors, and their fees, both of which were included in the statute when originally enacted in 1929.

Defendant's position is that section 13 of article IV requires that "Any statute that modifies the method of impanelling jurors must be incorporated into the Jury Commissioners Act." There is, of course, no such constitutional requirement. The principle that where a law is complete in itself it is valid although its effect may be to repeal existing laws, or modify or amend them by implication, is firmly established. (*People* v. *Deatherage,* 401 Ill. 25, 42; *Aaron & Bros.* v. *McKibbin,* 392 Ill. 558; *People ex rel. Curren* v. *Wood,* 391 Ill. 237, 256; *St. Louis Bridge Co.* v. *Becker,* 372 Ill. 102; *Malloy* v. *City of Chicago,* 369 Ill. 97; *Steinhagen* v. *Trull,* 320 Ill. 382; *People ex rel. Egan* v. *City of Chicago,* 310 Ill. 534; *People ex rel. Stuckart* v. *Knopf,* 183 Ill. 410, 415.) "It is not necessary, when a new act is passed, that all prior acts modified by it by implication shall be re-enacted and published at length." *Co-ordinated Transport, Inc.* v. *Barrett,* 412 Ill. 321, 330.

That this principle applies as well to amendatory legislation when the amendment is within the scope of the title

of the act amended is also firmly established. For example, in *Malloy* v. *City of Chicago*, 369 Ill. 97, an amendment to the Civil Service Act amended by implication provisions of the Cities and Villages Act; in *People* v. *City of Chicago*, 349 Ill. 304, 322, an amendment to the Corporation Act amended by implication various statutes relating to railroads; in *Steinhagen* v. *Trull*, 320 Ill. 382, an amendment to the Statute of Descent amended the Dower Act by implication; in *Holmgren* v. *City of Moline*, 269 Ill. 248, an amendment to an act concerning hospitals amended by implication a statute concerning the issuance of municipal bonds. In each of these cases the validity of the amendatory act was sustained.

These consistent holdings rest upon the frequently reiterated proposition that section 13 of article IV of the constitution was not intended to strait-jacket the General Assembly in the manner for which defendant contends. As stated in *People* v. *City of Chicago*, 349 Ill. 304, 321-322: "Even if the 1929 amendment were to be construed as amending earlier acts by implication this would not render it obnoxious to the constitutional provision. In *Timm* v. *Harrison*, 109 Ill. 593, the court quoted with approval the following language of Mr. Justice Cooley in *People* v. *Mahaney*, 13 Mich. 481: 'If, whenever a new statute is passed, it is necessary that all prior statutes modified by it by implication should be re-enacted and published at length as modified, then a large portion of the whole code of laws of the State would require to be republished at every session, and parts of it several times over, until from mere immensity of material it would be impossible to tell what the law was.'" Provisions concerning the selection of jurors are clearly within the scope of the title of "An Act in relation to Municipal courts in cities and villages." (Ill. Rev. Stat. 1953, chap. 37, pars. 442-504.) The amendatory act relates to the same subject; its title recited its purpose to amend section 42, and the

section as amended was set forth in full. The trial court correctly held that section 13 of article IV of the constitution had not been violated.

Defendant also urges that section 42 is invalid because it is indefinite and incomplete, because it does not state at whose convenience jurors summoned for service in one court are to be impanelled in another, and because it does not prescribe in detail the method to be followed in selecting the particular jurors who are to serve in the municipal court.

We think it is so obvious that the statute is concerned with convenience in the administration of justice that no discussion is warranted. The absence of meticulous detail as to the procedure to be followed does not affect the validity of section 42. No juror was called except one who had been selected and drawn in the office of the jury commissioners in the manner contemplated by statute. Defendant has received the benefits of the safeguards of the Jury Commissioners Act. There was no discrimination in selecting those jurors who were to serve in the municipal court. We hold that the statute need not prescribe with minute particularity the precise procedure to be followed. It suffices that the initial selection of jurors was made in conformity with the Jury Commissioners Act and that the particular assignment of qualified jurors to the municipal court was nondiscriminatory.

On the merits defendant's position is that the trial court committed reversible error by "submitting to the jury three charges for which there was no proof either as to negligence alleged or as to the causal relation." This contention requires a review of the evidence taken in the aspect most favorable to the plaintiff. It appears that on the morning of April 16, 1952, William E. Starck and a fellow employee, both signal maintainers, went to a point on defendant's main line three-quarters of a mile east of Geneva, Illinois, to replace a telephone box. The telephone box was

attached to a large relay box in close proximity to and south of the southernmost east and west track. There are two east-west tracks adjacent to and north of the relay box; a spur track joins the southernmost track immediately to the east of the relay box. The tracks run downgrade from the east to the point of the accident for a distance of one and a half to two miles. The westbound suburban train which struck the decedent "drifted" downhill along this stretch. The practice of turning off the steam and "drifting" downhill makes the engine "thoroughly quiet." Shortly before the accident, an eastbound transcontinental passenger train left the station at Geneva and travelled on the northernmost track; this train passed the suburban train at about the time of the accident. The noise of the transcontinental train's double unit diesel engine was comparable to "a big DC-6 plane when it takes off at the airport."

The engineer of the westbound surburban train testified that the engine was headed backward at the time of the accident; that the tank, or tender, was in front of the engine; that he observed the eastbound train as he had rounded a curve approximately three quarters of a mile east of the point of the accident; that he first observed Starck when his train went under a bridge 300 to 500 feet from the scene of the accident; that Starck was kneeling or bending over an object on the ground near the relay box; "I couldn't say if he was looking at it;" that he took his eyes off of Starck for a few seconds because he had to turn around to put his hand on the brake valve to release the brake which he had set when he "entered the hill;" that his train was traveling about 15 miles per hour when he first noticed Starck and had slowed down to about 8 to 10 miles per hour at the time of the accident; that he saw Starck fall backwards and brought the brake back to service and stopped the train; that the train's engine bell was ringing immediately prior to and at the time of the

accident but he did not blow the train's whistle at any time because Starck appeared to be well in the clear of the locomotive. The fireman on the suburban train testified that the custom and practice was to blow the whistle "If you see the man engaged in some type of work and do not think he sees you, even if they are in the clear."

The trial court gave three instructions to the jury relating to defendant's duty to furnish decedent with a safe place to work. A portion of instruction No. 5 declares: "It is also the claim of the plaintiff that the defendant failed to exercise ordinary and reasonable care to provide the decedent with a reasonably safe place to work." Instruction No. 12 reads: "The jury is instructed that it was the duty of the defendant to exercise reasonable care to furnish the deceased with a reasonably safe place in which to do his work." Instructon No. 13 says: "The jury is instructed that if you find from the greater weight or preponderance of the evidence under the instructions of the court, that at the time of the occurrence in question the defendant failed to give the decedent any notice or warning of the approach of the train or to maintain a proper lookout in the direction of the movement or to use reasonable care to provide decedent with a reasonably safe place to work in one or more of the respects mentioned, and if you further find from the greater weight or preponderance of the evidence that such failure, if any, was negligence and if you further find from the greater weight or preponderance of the evidence that such negligence, if any, was proximate cause in whole or in part of the death of the decedent then you are instructed that you should find the defendant guilty."

Defendant insists that the record contains no evidence tending to establish negligence in failing to furnish a safe place to work and that the giving of these instructions constitutes reversible error. The rule requiring an employer to furnish his employees with a reasonably safe place to

work imposes the "duty only of keeping the premises physically safe and has no reference to anything else," (*Fisher* v. *Chicago, Rock Island and Pacific Railway Co.* 290 Ill. 49, 58,) and an instruction on that rule whère there is no evidence tending to establish a violation of such duty is erroneous. (*Keefe* v. *Armour & Co.* 258 Ill. 28, 34, 35.) See, also, *Peterson* v. *Chicago and Oak Park Elevated Railroad Co.* 260 Ill. 280; *Nordhaus* v. *Vandalia Railroad Co.* 242 Ill. 166. Whether a place which is rendered temporarily unsafe by active negligence is within the rule, is a question which has not been clearly resolved. (Compare *McGivern* v. *Northern Pacific Railway Co.* 132 Fed. 2d 213, and *Atlantic Coast Line Railroad Co.* v. *Dixon,* 189 Fed. 2d 525, with *Griswold* v. *Gardner,* 155 Fed. 2d 333.) That question, however, is not squarely presented. Instruction No. 13 expressly limited the concept of "safe place to work" to the active negligence charged. The instruction declared that defendant was liable if it failed to furnish a safe place to work "in one or more of the respects mentioned" in the initial portion of the instruction,—that defendant "failed to give the decedent any notice or warning of the approach of the train or to maintain a proper lookout in the direction of the movement." So limited, the instructions, although perhaps subject to criticism, were not so prejudicial to defendant as to require a reversal and a new trial.

In several instructions, as illustrated by instruction No. 13, the court instructed the jury that plaintiff charged that the defendant failed to give the decedent any notice or warning of the approach of the train. Defendant asserts that the submission of this charge to the jury constitutes reversible error because (a) the complaint charged simply that defendant failed to give any warning and the evidence conclusively established that the regulation engine bell was ringing at all times immediately prior to and at the time of the collision; (b) there was no evidence which showed

that the decedent would have heard the train whistle had it been blown; and (c) there was no evidence that the failure to whistle was a proximate cause of the accident. In a recent case involving the Federal Employers' Liability Act we restated the familiar rule that a motion for judgment notwithstanding the verdict presents only a question of law as to whether, upon a consideration of the evidence, with all reasonable inferences taken most favorably to the plaintiff, there is a total failure or lack of evidence to prove any necessary element of plaintiff's case. (*Bonnier v. Chicago, Burlington & Quincy Railroad Co.* 2 Ill. 2d 606.) From a careful examination of the record, we find that the evidence, so construed, justified the submission to the jury of plaintiff's charge, which must be regarded as relating to an adequate warning under the circumstances existing at the time of the accident.

The trial court, by instructions Nos. 5 and 13, also submitted to the jury the question of whether defendant's engine crew failed to keep a proper lookout. Defendant points out that its engineer testified that Starck appeared to him to be "well in the clear of the locomotive" and that Starck's coworker testified that Starck was working well in the clear of trains on the west side of the telephone box shortly before the accident. The record, however, discloses that Starck was seen bending over an object near the track shortly before the accident; that the engineer took his eyes off Starck a moment or two before he was struck, and that the view of the fireman, who was not busy at the time and was looking out, was obstructed by the tender in front of him; that Starck was struck on the head by the rear step of the locomotive, which was about 18 inches above the top of the rail. The evidence clearly warranted the submission to the jury of the questions whether Starck was actually "in the clear," whether the crew failed to keep a proper lookout, and whether Starck was killed as a proximate cause of the defendant's negligence. Our disposition

of defendant's contentions relative to the submission of charges to the jury is decisive of the further contention that the evidence conclusively shows that Starck's own conduct in leaving a place of safety was the sole proximate cause of his death. The evidence was sufficient not only to justify submission of the issues to the jury, but also to support its verdict.

When the jurors were brought in for their *voir dire* examination, defendant moved to exclude from the courtroom decedent's two sons, three and five years of age, who were sitting in the back of the room. The court permitted the children, who were well-behaved, to remain in the courtroom for the rest of the day but ordered that they be thereafter excluded. Relying upon *Barnett* v. *Noble*, 155 Ill. App. 129, a personal injury action, defendant says that permitting the children to remain in the courtroom tended to arouse sympathy and thereby to increase prejudicially the award of damages. The *Barnett case* was concerned with the exhibition of the plaintiff's wife and small children in the courtroom in a case in which evidence of the fact that plaintiff had such dependents was not admissible; it is not decisive here, where the children were parties in interest.

Finally, defendant asserts that the verdict of $54,300 was grossly excessive and that the trial court committed four errors which tended to increase materially the size of the verdict. On the question of damages, it was stipulated that Starck's earnings for 1951 were $5,083.58. The evidence shows that he was thirty-seven years old at the time of the accident; that he left surviving his widow, who was slightly older than he, and two sons, one and one-half and three and one-half years old. Starck regularly turned over all his earnings to his wife who gave him about $50 monthly for spending money. An actuary testified that on the date of the trial Starck would have a life expectancy of 29.43 years and his wife an expectancy of

26.42 years; that on the basis of Starck's 1951 earnings, his monthly earnings were $423.64; that deducting from those earnings $50 monthly spending money and $36.30 estimated income taxes gave a base monthly figure of $336.34; that 25.22 years from the date of the trial would have brought decedent to a retirement age of 65, and that the present value of $336.34 payable at the end of each month for 25.22 years discounted at the rate of 2½ per cent is $75,752.22 and discounted at the rate of 3 per cent is $71,721.61. A vice-president of a Chicago bank and trust company, who specialized in investments, testified that 3 per cent would be a safe return on an investment for a widow without any special training in the investment field.

Defendant asserts that the actuary's figures based upon a 2½ per cent discount rate were erroneously admitted; that anything less than a 3 per cent discount rate is too low. To support its assertion, defendant cites *Southern Pacific Co.* v. *Guthrie,* 186 Fed. 2d 926, where the court not only affirmed the judgment as to liability and the amount of damages but also held that judicial notice could be taken of what would constitute a fair rate of return, observing, "There is of course no rule of law which determines the probable rate of interest obtainable upon investments in safe securities." In any event, we fail to see that prejudicial error was committed on this point, particularly since the actuary also gave the jury his figures based upon a 3 per cent discount rate, to which defendant did not object.

Defendant's second point with respect to damages rests upon a misunderstanding. Defendant urges that the court erred in permitting the actuary to calculate expected lost benefits upon the basis of life expectancy rather than work expectancy. The record conclusively shows that the actuary's figures were calculated on decedent's retirement at the age of 65. Defendant also contends that the actuary should not have been permitted to calculate expected lost

benefits upon the basis of Starck's life expectancy, alone, rather than on the joint expectancy of Starck and his wife. Starck's life expectancy was a material fact, which was proved. We perceive no more reason for calculating expected lost benefits upon a joint life expectancy table for Starck and his wife than for requiring a calculation based upon a joint life expectancy of Starck, his wife and their two children. Defendant's fourth point on damages is likewise without merit. It asserts that the jury failed to take into account the decedent's contributory negligence; that the failure of the jury to diminish properly the amount of damages by the percentage of plaintiff's negligence is error requiring a new trial (*Wetherbee* v. *Elgin, Joliet & Eastern Railway Co.* 191 Fed. 2d 302,) and that the assumed reduction of approximately 27 per cent in the present case is not enough. We cannot say the decision of the jury is manifestly improper. Defendant has failed to show that the verdict of the jury, under all the circumstances, is unreasonable.

The judgment of the municipal court of Evanston is affirmed.

*Judgment affirmed.*