Harold C. MYERS, Appellant,

v.

P. L. GEORGE and National Wrestling Alliance, a Corporation, Appellees.

No. 16188.

United States Court of Appeals
Eighth Circuit.

Oct. 27, 1959.

James G. McDowell, Jr., Des Moines, Iowa, for appellant.

Harry N. Soffer, St. Louis, Mo. (Burton M. Greenberg, University City, Mo., on the brief), for appellee National Wrestling Alliance.

Before GARDNER and VOGEL, Circuit Judges, and MICKELSON, District Judge.

PER CURIAM.

Appellant Harold C. Myers brought this action against appellees P. L. George and the National Wrestling Alliance to recover damages, alleging that appellees,

through their monopoly on wrestling in the United States, deprived appellant of his right to earn a living as a wrestler or to promote wrestling with his carnival in the State of Iowa, in violation of the Anti-Trust Acts, Sections 1 and 2, Title 15, United States Code. The parties will hereinafter be referred to as they were designated in the trial court.

Plaintiff at all times pertinent to the issues was and now is a professional wrestler, while the defendant National Wrestling Alliance is a corporation organized for and on behalf of professional wrestling and bookers and promoters of wrestling. Plaintiff alleged that defendants were bookers and promoters of wrestling and have a monopoly on all professional wrestling. At a pretrial proceeding it was made to appear, either by consent of counsel for the respective parties or by judicial notice, that some two years before the commencement of the instant action suit had been brought against the defendant National Wrestling Alliance by the Government charging violation of the Anti-Trust Acts, and that in that suit a consent decree had been entered against defendant National Wrestling Alliance in which it in effect admitted its monopoly and agreed to refrain from doing so in the future. At the pretrial proceeding the court entered an order directing that "there will be no mention made at the trial of any consent decree entered against National Wrestlers Alliance." The action was tried to the court and a jury and resulted in a verdict for the defendants. From the judgment entered on the jury's verdict plaintiff prosecutes this appeal and seeks reversal on substantially the following grounds: (1) the court erred in making a farce out of the trial of the plaintiff's case by making jocular remarks from the bench, and (2) the court erred in failure to allow the plaintiff to answer an argument by defense counsel that, "if they were guilty of monopoly the Government would have done something about it."

It is earnestly contended that the trial court made a mockery of the trial by reason of certain remarks made during the course of the trial, variously referred to as unsolicited, jocular, belittling, witty, unjudicial, and prejudicial to the cause of the plaintiff.

During the empaneling of the jury the trial judge referred to the professional wrestling game as, "sometimes considered by some people to be a racket anyway." While plaintiff was on the witness stand being examined by his counsel, the following occurred:

"Q. Well, are you, in the wrestling profession, acquainted with the territories that are had by the bookers?

"The Court: Unless this witness has his contract here, some paper that denotes what his territory is, it would not be admissible. It would be hearsay at best.

"Mr. McDowell: Well, this is quite important, your honor.

"The Court: If the witness knows where Oklahoma is, he can testify to that."

During the examination of a member of the Fair Board of Avoca, Iowa, the following occurred:

"Q. Do you recall in the '54 show or exhibition was Mr. Myers to furnish the referee?

"The Court: He certainly wouldn't pay a referee anything here, Senator. They certainly would take care of themselves and not hurt each other."

During the examination of another witness the following occurred:

"Q. Whether you call it an exhibition or a match, as they are both described in this, did that ever come into the Board's mind as to whether or not the fellow that's putting on the show should wrestle the main event and pay his competitors and also pay the referee? A. In 1954 we booked the match Myers and Dusek as a grudge match. They had wrestled in '53 and the blood was drawn and the crowd got a big rouse out of it, so they come back

in '54. It was the same thing. We weren't interested in the referee.

"The Court: In other words, you were selling blood?

"The Witness: That's right, we were selling blood.

"Q. And the show was furnished and the wrestlers showed up and the money was paid and the refund was made to you folks, and so forth, isn't that right? A. Yes, right.

"The Court: Was there blood?

"The Witness: No blood.

"Q. You didn't ask Mr. Myers to promote in '55 or '56? A. The wrestling wasn't particularly profitable as far as the Fair was concerned.

"The Court: Tell me, how did your people around Avoca possibly survive without it?"

During the examination of another witness the following occurred:

"Q. And as I understand it, you rented the ring for $50 from a man that put on wrestling shows in Atlantic? A. I don't know whether he did or not. He advertised that he had a ring for rent. I don't know what his business was.

"Mr. O'Malley: That's all.

"Mr. Soffer: No questions, your Honor.

"The Court: Hadn't it ever occurred to you that you could rent a race horse much cheaper than that?

"The Witness: It does now, sir."

Counsel for the plaintiff announced that he desired to call as a witness a Mr. True, whereupon the court said:

"I can see now that Mr. True is not going to be very good. He is going to belie his name. (Shaking his head.) But he'll be like the old gray mare that I so frequently refer to, except that he's not all hell to get, but he isn't going to be worth a damn when you get him."

During the examination of a witness called by the plaintiff, the following occurred:

"Q. Where do you promote? A. Well, I have a show tonight in Moberly, Missouri. I have one Thursday night in Kansas City, Kansas.

"The Court: May I intervene?

"The Witness: Yes, sir.

"The Court: How did you continue your promoting, your relation with wrestling, and keep your religion?

"The Witness: Keep my what?

"The Court: Religion.

"The Witness: Well, sir, I think that people get more for their money in wrestling than anything in the world. I think we are giving them more for their money than anything in the world, so if you give people what they are paying for then you are honest.

"The Court: All right."

During the testimony given by plaintiff with reference to his income from his wrestling bouts, the following occurred:

"Q. Well, how much did you make down there at Kansas City? A. Well, as I said yesterday, you take year in and year out, probably my average would be between fifty and seventy-five dollars a night that I worked. Naturally I had many, many main events there which had good payoffs.

"Q. What do you mean, 'good payoffs?' A. Well—

"The Court: Suckers. * * *

"Q. All right. Now, you say you were taken off of television. Why is that important to a wrestler? A. Why is it important to a wrestler? It's probably one of the biggest monitors of publicity in the wrestling game today. If you are not on television at times, you don't do too well at all. In other words, television more or less puts you out in front of the people's eyes. They see who you are. If they like you or want to come see you, they will come and see you, because it's good publicity. If you just come in from

out of a dark corner some place and be on a wrestling card as far as having—

"The Court: You mean by that that the women in the home audiences can see the hair on your chest and come out if they want to see you, is that correct?

"The Witness: No, sir.

"The Court: Well, who does?

"The Witness: Either you have ability or you don't have ability. If you have ability that appeals to the public, why naturally they want to come and see you. If you don't, you might as well stay where you were.

"The Court: Well, I will stay home. * * * We are not trying to build reputations of amateur wrestlers or anything of that kind. We are trying to build a livelihood in a so-called art, which is not an art. It's the art of acting. It gets money and all that, and of course it is wrongful to deprive a man of that pursuit if he wishes to follow it. It's a legal, lawful pursuit. But I may have my little fun about it.

"Q. All right. When you were just getting—let me ask you this— were you on your way up in your field in 1954? A. Definitely. •

"Mr. O'Malley: Just a moment.

"The Court: Just a moment. That would—modesty forbids his saying so. That's true if—I suppose it would be true if the witness said so, providing he was matched right. He has to win his alleged matches. * * *

"Q. Now let's get to '56. I hand you what the reporter has marked Exhibit Z–16, and ask you whether or not those are two representations of wrestling programs you have been on in Amarillo, Texas?

"The Court: Mr. Myers, did you study the bricklaying trade or something like that in '55 and '56, along there?

"The Witness: For my income?

"The Court: Yes.

"The Witness: No, sir, your Honor, but I will explain that after a while.

"The Court: Well, I don't know whether you will or not. I sought to gain an explanation right then.

"The Witness: Right then?"

There were other remarks by the court during the trial of an unorthodox character but their recital would, we think, unduly extend this opinion and serve no useful purpose.

In Bacon's essay on "Judicature", the learned author, in referring to the conduct of a trial judge, among other things said:

"Judges ought to be more learned than witty; more reverend than plausible; and more advised than confident. Above all things, integrity is their portion and proper virtue * * * Patience and gravity of hearing is an essential part of justice; and an over speaking judge is no well-tuned cymbal. * * * The place of justice is a hallowed place; and therefore not only the Bench, but the foot pace and precincts and purprise thereof ought to be preserved without scandal and corruption."

■ Manifestly, the conduct of the trial judge here under consideration comes far short of meeting the Baconian standard. The rule governing the conduct of the trial judge in the Federal courts is much more liberal than that prevailing in most of the State courts. The procedure in this regard is that prevailing at common law at the time of the adoption of the Constitution and is frequently referred to as the English system. The judge is not a mere moderator. He may summarize and discuss the evidence, provided that he does so in an impartial manner, and he may even express an opinion as to the credibility of testimony, provided always that he makes it perfectly clear that the jury is not bound by his expressed opinion but is the sole

judge as to the facts and as to the credibility of all testimony. In Starr v. United States, 153 U.S. 614, 14 S.Ct. 919, 923, 38 L.Ed. 841, the applicable rule is thus stated:

"It is true that in the federal courts the rule that obtains is similar to that in the English courts, and the presiding judge may, if, in his discretion, he think proper, sum up the facts to the jury; and if no rule of law is incorrectly stated, and the matters of facts are ultimately submitted to the determination of the jury, it has been held that an expression of opinion upon the facts is not reviewable on error. * * * It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling."

In Rudd v. United States, 8 Cir., 173 F. 912, 914, this court said:

"We do not mean to impair in any degree the right of a trial court in both civil and criminal cases to comment upon the facts, to express its opinion upon them, and to sum up the evidence, for that is one of the most valuable features of the practice in the courts of the United States. A judge should not be a mere automatic oracle of the law, but a living participant in the trial, and so far as the limitations of his position permit should see that justice is done. But his comments upon the facts should be judicial and dispassionate, and so carefully guarded that the jurors, who are the triers of them, may be left free to exercise their independent judgment."

While the trial judge may, when the situation warrants, discuss the evidence he must do so impartially and abstain from advocacy for either party. Cook v. United States, 8 Cir., 18 F.2d 50; Boatright v. United States, 8 Cir., 105 F.2d 737;

Cline v. United States, 8 Cir., 20 F.2d 494; Stokes v. United States, 8 Cir., 264 F. 18; Hurwitz v. United States, 8 Cir., 299 F. 449; Weare v. United States, 8 Cir., 1 F.2d 617. In reversing a judgment of conviction in Cook v. United States, supra, we said, inter alia [18 F.2d 52]:

"The court did tell the jury that his opinion on the facts was not controlling upon them, but that did not in our judgment cure the error. Every one knows that suggestions from the court have great weight with a jury, and the argumentative language used in this instruction must have seemed to the jury an advocacy of the government's case, and impressed upon them the court's desire for a conviction. We think it was not such judicial discussion of the evidence as is permissible. Certainly the language is as argumentative as that used by the court in the case of Cook v. United States, [8 Cir.] 14 F.2d 833, which this court decided necessitated a reversal of the case."

In the cases cited reversals were had because of statements made in the court's instructions to the jury. In the instant case the statements were made during the course of the trial. They did not even constitute rulings as to the admissibility of evidence but were voluntary and were clearly prejudicial in their character. The wrestling game was in effect referred to when the jury was being empaneled as a "racket". When plaintiff's counsel announced that he wished to call a witness by the name of True, the court, without any apparent provocation, said:

"I can see now that Mr. True is not going to be very good. He is going to belie his name. (Shaking his head.) But he'll be like the old gray mare that I so frequently refer to, except that he's not all hell to get, but he isn't going to be worth a damn when you get him."

This certainly could not have assisted the jury in weighing the testimony, though

it may have amused the jurors and the courtroom audience. Another expression indicated that wrestling contests are fixed in advance and that people who attend wrestling matches are "suckers". The general effect of these expressions was to ridicule and belittle plaintiff's calling and his alleged cause of action and tended to make a mockery out of the trial. The mere fact that the court in its instructions advised the jury that they were the sole judges as to the facts could not cure the error nor erase its effect upon the jury. It is argued that no objections were made to these remarks, but when made we do not see how their effect could have been cured and objections made would have been futile. The statements of the trial judge here complained of were prejudicial and to refuse to consider them on this appeal would result in a manifest miscarriage of justice. The applicable rule with reference to the conduct of the trial judge in jury cases is well stated in 53 American Jurisprudence, Trials, Section 76, page 75, as follows:

"In jury trials the trial judge should be cautious and circumspect in his language and conduct before the jury. He must be fair to both sides, and the extent to which he may go in comments and remarks during the trial is governed by the fundamental principle that nothing should be said or done by him which will prejudice the rights of the parties litigant. Especially should he refrain from any remarks that are calculated in any way to influence the minds of the jury or to prejudice a litigant. This includes remarks to counsel touching the management of the case and reflecting on their conduct, as well as those touching the character of the witnesses and the value of their testimony."

■ It is urged by plaintiff that the court erred in denying plaintiff's counsel the right to reply to an argument of counsel for defendant to the effect that had defendants been guilty of monopoly as alleged by plaintiff the Government would have done something about it. It is without doubt that counsel's argument contained assertions that were not true; that it misled the jury; and that it was contrary to the pre-trial order of the trial court. Of themselves, such remarks would justify the granting of a new trial. Chicago & N. W. Ry. Co. v. Kelly, 8 Cir., 84 F.2d 569; London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325. However, the objection is not as to the argument of counsel for defendant but as to the refusal of the court to permit counsel for plaintiff to answer the argument. In view of the fact that the case must be reversed for the reasons heretofore stated, and as it is unlikely that this question will again arise on retrial, we express no opinion as to this ruling of the court.

■ We are convinced that plaintiff, by reason of the comments of the trial judge during the trial, was prevented from having a fair trial. The judgment appealed from is therefore reversed and the cause is remanded to the trial court with directions to grant plaintiff a new trial.