**Carol CAVENDISH, Administratrix of the Estate of Carlos Cavendish, Plaintiff-Appellant,**

v.

**SUNOCO SERVICE OF GREENFIELD, INC., Defendant-Appellee.**

**No. 18676.**

United States Court of Appeals, Seventh Circuit.

Nov. 29, 1971.

Rehearing Denied Dec. 22, 1971.

Earl C. Townsend, Jr., Indianapolis, Ind., F. Boyd Hovde, Indianapolis, Ind., for plaintiff-appellant; Townsend, Hovde & Townsend, Indianapolis, Ind., of counsel.

Howard J. DeTrude, Jr., C. Warren Holland, John N. Thompson, Indianapolis, Ind., for defendant-appellee; Kightlinger, Young, Gray & Hudson, Indianapolis, Ind., of counsel.

Before KNOCH, Senior Circuit Judge and KILEY and CUMMINGS, Circuit Judges.

KNOCH, Senior Circuit Judge.

Plaintiff-appellant Carol Cavendish, Administratrix of the Estate of Carlos Cavendish, has taken this appeal from judgment for the defendant-appellee, Sunoco Service of Greenfield, Inc., consequent on the verdict for defendant in a jury trial of plaintiff's action for the benefit of the widow and child of Carlos Cavendish, brought pursuant to the Indiana wrongful death statute, Burns § 2–404, IC 1971, 34–1–1–2.

On Sunday, March 3, 1968, the decedent, Carlos Cavendish, his wife and child were driving from Summerville, West Virginia, to Indianapolis, Indiana, on Interstate Highway 70. It was about

11:00 P.M. when the decedent left Interstate Highway 70 at Indiana State Highway 9. Although the decedent turned south when he left Interstate 70, he soon learned that he was driving south in the northbound lane. In attempting to change to the proper lane he found himself straddling the concrete median divider separating the north and southbound lanes of the State Road 9 overpass crossing Interstate 70, from which he was unable to dislodge his car. It was then about 11:15 P.M.

Leaving his parking lights on, he, his wife and child secured a ride into Greenfield, Indiana, where he hired Sunoco Service, whose employee, James Rockey (originally a defendant herein, but dismissed without prejudice on motion of plaintiff before final argument) who drove decedent, his wife and child, back to the site in a wrecker truck. Mr. Rockey pulled up behind the decedent's car, turned on rotating beacon and flashing lights and walked over to the car. He then turned the wrecker and backed it up to the car. The wrecker was equipped with a rotating beacon on top and amber flasher lights, two of these in the grille, which were in operation all the time the wrecker was at the site. Amber lights on the rear view mirrors were also in operation. There were in addition red flasher lights on the back, two on top of the boom, and two white working spotlights.

The first several efforts to pull the car away failed when the hook-up slipped off. Mr. Rockey again hooked the chain. The decedent, who had left the wrecker to watch the proceedings and to talk to Mr. Rockey, was standing at this point in the west lane of the two northbound lanes. Mr. Rockey saw a "semi" coming north with auto lights behind it. As he started to move the wrecker, he saw the automobile itself. He testified that it looked as though it would hit his wrecker truck. However, that had not been his impression the first time he saw the head lights of the approaching automobile. Plaintiff stresses the fact that Mr. Rockey in the wrecker truck was

in a better position to see than the decedent on the ground. He attempted to open his door to warn the decedent as the northbound automobile struck the decedent with its left front fender and killed him. It continued some way across the bridge, stopped and backed up. That automobile was driven by Mrs. Clulla Every, who was also initially a defendant in this case. Plaintiff explains that when it was ascertained that Mrs. Every had only $15,000 liability insurance, plaintiff, being destitute at the time, gave Mrs. Every a covenant not to sue in return for $12,500, and the action was dismissed as to Mrs. Every who was omitted as a defendant from the second amended complaint. Mrs. Every was a witness at the trial. She testified that she was blinded by the wrecker's headlights and in the absence of any fusees, or any other red light on the traffic side of the decedent's car, she had no warning that there might be persons out of vehicles on the pavement. Although witnesses testified to seeing the various lights on the wrecker truck from distances of one-quarter to three-quarters of a mile away, plaintiff asserts that Mrs. Every's view was blocked by the semitrailer in front of her.

It is plaintiff's theory that the death of the decedent was the result of defendant's negligence in causing the wrecker's headlights to blind oncoming traffic while at the same time failing to place red fusees, red flares, red electric lanterns or other red electric warning devices on the highway to alert other drivers, and that the rate of speed of Mrs. Every's vehicle was irrelevant.

Defendant argued, and the Trial Judge agreed, that the Indiana Statute, Burns § 47–2236, IC 1971, 9–8–6–42, pertaining to the positioning of flares beside disabled motor trucks, passenger buses, truck-tractors, trailers, semi-trailers or pole trailers, was inapplicable here in the absence of any evidence that the wrecker trucker was disabled while it was engaged in dislodging the decedent's automobile from the divider. Plaintiff's view is that while the wrecker truck was attached to

the decedent's car it was unable to move in any direction until it succeeded in dislodging the decedent's car. Thus plaintiff argues that the wrecker was "disabled".

The defense theory was that the accident was caused solely by Mrs. Every's negligence and the contributory negligence of the decedent himself who placed himself in the way of oncoming traffic at night, failing to maintain a proper lookout and failing to light the headlights of his own vehicle or to set out fusees or other lights which would have made him visible to other drivers.

There had been an allegation in the answer of defendant imputing negligence to plaintiff in failing to maintain a lookout and to warn her husband, but this was withdrawn on the day that the trial began.

Plaintiff's primary complaint is that her case was defeated even before trial by the nature of a preliminary indoctrination given the entire panel, from which the jurors in this case were selected, when they embarked on their duties more than two months in advance of this trial. Plaintiff informs us that she did not learn of the nature of this indoctrination or its departure from what plaintiff describes as the "approved" handbook (26 F.R.D. 549–558) with which plaintiff's counsel were familiar, until after the trial.

Plaintiff quotes segments from the indoctrination lecture to illustrate plaintiff's view that the Trial Judge's comments tended to degrade trial lawyers in general and plaintiff's lawyers in particular. Reading the entire lecture straight through, as the jurors heard it, we are not left with that impression.

The District Judge resorted to colloquial and homely terms in telling the prospective jurors about the proceedings in which they would play a vital role. For example he said that he held pre-trial conferences to find the heart of a controversy and "just shake the cracker barrel down." He stressed the importance of the jury's function. He offered practical advice on such mundane matters as parking one's automobile only in lots from which it could be retrieved at a late hour if the jury was obliged to remain at the court-house far into the night.

■ In concluding that the particular targets of the Judge's remarks were plaintiffs' lawyers, counsel refer to a statement that lawyers "want to win all twelve jurors" and reason that this must, of necessity, mean plaintiffs' lawyers only because so long as defense counsel persuade one juror not to vote with the other eleven, a defendant cannot be said to lose. However, as defense counsel here noted in oral argument, a defendant does not necessarily consider it a victory to have a "hung" jury and face another trial.

■ In the course of defining "evidence" the District Judge said that no matter how impressive or persuasive their words, or how like famous fictional attorneys seen in television dramas the lawyers appeared to the jurors, what the lawyers themselves said in argument was not "evidence" and that the jury were not to be "sucked in" (another phrase to which plaintiff takes exception) to believing otherwise. He also explained his calendar problems and pointed out that extra cases would sometimes be set for a particular day because "maneuvering" by counsel might result in settlements. Plaintiff feels that "maneuvering" is a derogatory term in this context. Similarly, plaintiff feels that lawyers are disparaged by reference to their coming back to court after a noon recess with witnesses "refurbished." The Judge at that point was explaining why he might run past the usual lunch time to complete a witness' testimony lest counsel and witness come back from lunch "refurbished" and repeat everything previously said for fear that the jury might have forgotten it. He invited the jurors who became uncomfortable during such lengthened sessions to bring the matter to his attention, and they would "try to live together." He also stressed the fact that the jurors were now "in the public eye," that there would be persons who would

know them but whom they would not know. He told the jurors that lawyers and investigators were professionals and that the jurors must assume these professionals knew more about the jurors than the jurors might suppose. However, his subsequent comments made it clear that the purpose of these warning was not to denigrate the lawyers but to encourage the jurors to conduct themselves with discretion as judges of the facts and not to loiter about the lobby of the courthouse striking up random conversations. He said, "Remember, litigants take a pretty dim view of a judge standing on the street corner talking to a witness from the other side, or a lawyer."

■ At another point in cautioning jurors against discussing what went on in the jury room, the Judge said that lawyers and investigators often carried recording devices when conducting interviews, would write down what was said and ask for signatures, or would bring along a witness who could later testify, in a hearing on a motion for a new trial, to some careless comment made by a juror who might then find himself in an embarrassing position. He went on to outline the kinds of conduct in a jury room which might properly be considered in overturning a verdict. Along this same line, he later reminded counsel at the conclusion of the jury's deliberations, prior to announcement of the verdict, and out of the presence of the jury, that he had advised the jury that it was the best practice for them not to discuss what went on in the jury room and said that the lawyers would only embarrass themselves by endeavoring to talk to them. He asked for the cooperation of the lawyers in this regard particularly as these jurors were part of a panel whose services would be needed again. Plaintiff considered the remark about electronic devices as reflecting adversely on lawyers. We consider that this inference, like the others mentioned, represents a strained interpretation of the Judge's statements.

■ Plaintiff views as more serious what plaintiff characterizes as a mis-statement of the law which plaintiff thinks was markedly prejudicial because this trial, her counsel said in oral argument, was the first case these particular jurors had tried after the indoctrination two months earlier.

The Judge said repeatedly that he would provide the jurors with the law of the case by reading written instructions which would go into the jury room with them, and added that the foreman could use these as a reference in cases of dispute in the jury room. To illustrate the concept of the elements involved in a case, the Judge used a personal injury case as an example, noting that he would later define such terms as "negligence" and "proximate cause". He said there might be defenses, such as negligence of the plaintiff, which was a contributing proximate cause of the accident, in which case the plaintiff could not recover, because the jurors did not weigh negligence in Indiana. Then came the phrase which plaintiff considers so serious an error: "If you are just a little bit negligent you can't recover from the other fellow."

Plaintiff argues that this incomplete description of how a negligent motor vehicle defendant could be exculpated on the basis of contributory negligence (without saying such contributory negligence must be a proximate cause) was improper when this issue would arise in a matter on the calendar of cases for this jury to try.

However, in introducing the example, the Judge had said:

" * * * if the defendant believes that the plaintiff, himself, in the operation of his vehicle was negligent, then under the law, if that be true and it be a contributing proximate cause of the accident, * * * *."

After the statement to which plaintiff objects, the Judge said again that he would set out this principle in an instruction if such a question arose and promptly added that an essential element of such a defense would be:

"Whether or not the misconduct of the plaintiff proximately contributed to

cause the accident and alleged injuries, losses, and expenses of the plaintiff." At the end of the trial the jury was properly instructed on this element of the case. We do not believe that the jury could have been confused as plaintiff fears.

█ Appellant complains further that the Trial Judge improperly interfered with the trial, impressing on the jury his own view that Sunoco's responsibility was superseded by that of Mrs. Every. To support this view appellant refers to redirect examination of Trooper Michael S. Smith, a state police officer called as a witness for the defendant, in the course of which the Trial Judge asked several questions obviously in the interest of achieving clarity on the line of inquiry as to the legality of the red light, if any, on the wrecker truck. Plaintiff asserts that the Court attempted to convince the jury that it was lawful for a slow-moving vehicle to display a red beacon from the front although the statute, Burns § 47–2254, IC 1971, 9–8–10–4, refers only to a red or amber flashing lamp to be visible from a distance of not less than 500 feet to the rear.

Plaintiff argues that she was prevented from showing that the police officer failed to arrest the wrecker truck driver only because of personal friendship. But the officer did say that he did not arrest the driver for the violation of having a red light on top of a non-emergency vehicle because this particular vehicle was often used to go to the scene of an accident to help persons pinned in vehicles, and because so many other wreckers had red lights on top that if he were to arrest one he would have to make a mass arrest of all. He also said that this violation, if any, did not occur in his sight. Counsel for plaintiff then said that the witness had testified that maintaining a red light on a vehicle was an offense if it were viewable from the front of the vehicle. The Trial Judge instructed the jury to disregard counsel's comments as not the law. He then sustained an objection and directed the jury to disregard a further question as to whether the of-

ficer had ever arrested this driver on other occasions when he had seen him operating his truck with a red light on top.

When the Judge instructed the jury on the law at the conclusion of the trial, he read § 47–2254, giving all of its provisions. He also instructed the jury later that the credibility of some of the police officer witnesses was in issue as to whether or not they favored the defendant by not arresting the driver for the alleged violation respecting the flashing light.

Plaintiff argues that it was only after her counsel's objection to the Court's conducting the examination of the witness, that the Court desisted, saying to defense counsel, "All right, you pick it up and go from there." Plaintiff says this was an example of "teamwork" between bench and defense which destroyed the Judge's impartiality in the eyes of the jury. The objection made, however, was not to the fact of the questioning by the Court, but to the information being elicited which plaintiff's counsel said called for a conclusion. Immediately after the next question by defense counsel, the Trial Judge sustained plaintiff's objection.

We have carefully read the entire examination of this witness and conclude that the jury could not have been misled.

█ Plaintiff relies heavily on remarks made by the Judge after the verdict in which he said that he felt it was incumbent on him to instruct at length concerning Mrs. Every and her obligations. These remarks all came after the verdict and whatever indication plaintiff sees in them as evidence of the Judge's personal view, our scrutiny of the transcript of the testimony and the instructions shows nothing from which the jury could reasonably have concluded, as plaintiff thinks they did, that the Judge wanted a verdict for the defense. At the time of these comments to which plaintiff refers, the Trial Judge also complimented the lawyers and told the jury that they had seen an example of competent trial work. The remarks of the Trial

Judge here are a far cry from those deplored in cases such as Myers v. George, 8 Cir., 1959, 271 F.2d 168 and Laney v. Amer. Airlines, Inc., 6 Cir., 1961, 295 F.2d 723, cited by plaintiff.

Some of the Judge's comments to which plaintiff objects occurred out of the presence of the jury during the conference on instructions wherein the Trial Judge said in casual terms (to which plaintiff would impute a strict technical and erroneous meaning) that there must be some instructions concerning Mrs. Every whose conduct was put in issue by the defendant's answer.

■ Another of plaintiff's complaints is that the Judge read so much of the motor vehicle code to the jury as to weary and confuse them because the Judge read § 47–2225(b), IC 1971, 9–8–6–29(b), prohibiting the moving of a vehicle on the highway with a lamp displaying a red light visible from directly in front, which plaintiff says conflicted with earlier references in the course of trial to the 1967 Slow Moving Vehicle Act as allowing rotating equipment on the front of a slow moving vehicle. Plaintiff's counsel at that time offered the opinion that the statute applied only to farm vehicles going 20 miles per hour and then asked for a recess to check the statute. In the instructions conference, the Judge pointed out that this particular wrecker was constructed so to speak "between statutes" and built without the triangular marking required by the later 1967 law.

We see no likelihood of confusion. The instructions explained that § 47–2225 did not forbid having a wrecker truck equipped with a red light facing front or operating that light at the situs of an accident or when parked. The jury was also reminded that there had been a conflict in the testimony as to whether the flashing light was actually in operation as well as whether it was amber or red in color.

■ Plaintiff objected to Instruction No. 19 respecting determination of the speed of Mrs. Every's vehicle, on the ground that the jury need not determine that issue in order to decide the case, and further to Instruction No. 21, on the ground that Mrs. Every's conduct was not an issue in the case. In the instructions conference, the Trial Judge explained that defendant in effect was saying that somebody else caused this accident, and that the jury must therefore be instructed on the operation of Mrs. Every's vehicle.

Careful study of the objections and the colloquy in conference on the instructions does not indicate that plaintiff contended in the District Court, as plaintiff does here, that the instructions as a whole represented an attempt by the Trial Judge to place the blame for the accident solely on Mrs. Every. Mrs. Every's actions as well as her testimony were clearly a part of the case and could not properly be ignored in the instructions.

■ With respect to Instruction No. 25, the sole objection at the conference was to the word "prescribed" which plaintiff at first thought should read "proscribed" but later, apparently, agreed with the Court that the word should be "prescribed". Plaintiff now says that the copy of Instruction No. 25 given to her counsel could not have contained the last three lines in which there is a reference to the negligence, if any, of "Mrs." Cavendish and that these lines could not have been read to the jury or the error would have been noticed by the Court or counsel. As the written instructions containing this reference went to the jury room, plaintiff feels that serious prejudice has resulted. Plaintiff notes that the defendant's answer at one time contained an allegation, later withdrawn, that there had been negligence on the part of the plaintiff, and that in the course of the introductory indoctrination of the jury, discussed above, the Trial Judge recommended recourse to the written instructions by the foreman in the event of dispute in the course of jury deliberation.

We agree with the defendant that the reference to "Mrs. Cavendish" is patent-

ly a typographical error which, as anyone who has overlooked misprints in checking printers' galleys knows, the mind tends to correct. In all likelihood the Judge in reading the instruction made the correction and counsel probably did the same, correcting the word to read "Mr.". In any event, we cannot conceive that the jury could have been misled. Throughout the instruction, the Trial Judge referred to Mrs. Cavendish as the "plaintiff", and the whole tenor of the instruction itself makes it clear that the negligence of the deceased Mr. Cavendish, if any, was meant.

Plaintiff argues that it was error to order the plaintiff's small son, a potential beneficiary of the estate, to be removed from the courtroom during the last half of the final arguments in a case to which the child was a party with a right to be present. Plaintiff asserts that the child was making no noise and was behaving as any other normal four-year old would.

Out of the presence of the jury, the Trial Judge said that all the time counsel had been arguing the child's playing with a windmill toy, "rolling a mile a minute," was distracting the jury and that the child ought to be removed from the courtroom for the remainder of the argument. There was no objection (which plaintiff now says was for fear of angering the Judge) and the child left. Plaintiff's counsel state that they themselves were unaware of the child's toy. Perhaps the Judge was in a better position to observe. We see no abuse of the Court's discretion to maintain the dignity of his courtroom and to conduct the trial in an orderly manner.

In Starck v. Chicago & N. W. Ry. Co., 1954, 4 Ill.2d 611, 623, 123 N.E.2d 826, 833 and Freimann v. Gallmeier, 1945, 116 Ind.App. 170, 179, 63 N.E.2d 150, 153, on which plaintiff relies, the Court merely held in the first case that it was not prejudicial to allow the children of plaintiff's decedent to remain at the back of the courtroom for the remainder of the first day of trial (excluding them thereafter) and in the second case that a mo-

tion for continuance was addressed to the sound discretion of the Trial Court despite the fact that motion for continuance was based on physical illness which prevented plaintiff's presence at the trial. The Court in Freimann found no abuse of discretion shown nor deprivation of any substantial right by denial of continuance. In this case, too, we find neither abuse of discretion nor deprivation of a substantial right.

We have referred to plaintiff's theory, with which the Court disagreed, that the wrecker truck was a "disabled" vehicle. Plaintiff cites as error the Court's refusal to instruct the jury on the duties incumbent on the driver of a disabled truck on a traveled portion of the highway. The record is bare of evidence that the wrecker truck was "disabled." The Court did instruct the jury respecting the duty of a parked vehicle.

Similarly plaintiff sees as error the refusal of a tendered instruction that Mrs. Every's negligence, if any, was not a defense and that if defendant's negligence alone or in combination with conduct of Mrs. Every proximately caused the death of Mr. Cavendish without fault on his part, verdict should be for the plaintiff. This was a partial duplication of material contained in Instruction No. 25 which was given. Plaintiff's presently stated objection to Instruction No. 25 did not concern that portion of it but only the last three lines which we have discussed above.

We have carefully considered these and all other points and authorities put forward by plaintiff in her appeal for a new trial. Our close scrutiny of the record and the transcript of evidence in the light of these points and authorities satisfies us that a new trial is contraindicated. The judgment of the District Court is affirmed.

Affirmed.

CUMMINGS, Circuit Judge (with whom KILEY, Circuit Judge, joins) concurring.

For the reasons given by my Brother Knoch, the preliminary indoctrination

given the entire panel from which the jurors were selected did not contain material that would justify reversal. However, to avoid recurring attacks on indoctrinations of potential jurors, trial judges will be well advised to confine their remarks more closely to the matters contained in the Handbook for Jurors Serving in the United States District Courts, 26 F.R.D. 549. Otherwise, counsel for unsuccessful litigants will press their attacks on this *ex parte* practice, which can so readily lead to abuse resulting in reversible error.